PAUL A. BONIN, Judge.
hln the aftermath of Hurricane Gustav, Buddy Searberry, an electrical lineman employed by Oklahoma Gas & Electric Company, was electrocuted and survived while on an emergency-assistance assignment near the southwest Louisiana town of Jennings. Mr. Searberry instituted this suit for personal injury damages against Entergy Gulf. States Louisiana, L.L.C., and Entergy Services, Inc.[1] Following a jury trial, a multimillion dollar judgment was rendered in his favor and against En-tergy.
Both Mr. Searberry and Entergy appeal aspects of the judgment. Entergy first asks that we set the judgment aside after a de novo review because the trial judge refused to instruct the jury, as Entergy requested, on its lack of duty to protect Mr. Searberry from a danger which was open and obvious to all, and instead instructed the jury that Entergy owed a heightened duty to Mr. Searberry. Alternatively, Entergy asks that we conclude that the jury abused its discretion in its assessment of general damages. Entergy further contends that the jury’s |2allocation of fault among itself’ Mr. Searberry, and Oklahoma Gas is clearly wrong and thereby asks for a reduction of Entergy’s share of the fault. For his part, Mr. Searberry asks that we find the jury’s assessment of his reduced earning capacity to be clearly wrong and that we increase it to the amount established by the uncontradicted expert testimony of an economist. Finally, both parties request that we respectively modify that portion of the judgment which was based upon the trial judge’s interpretation and application of an indemnity and hold harmless clause in the mutual assistance agreement between Entergy and Oklahoma Gas and allocated responsibility for Mr. Scarberry’s comparative fault to Entergy but refused to allocate Oklahoma Gas’s apportioned fault to Entergy.
Based upon our review of the record, including the proffered testimony, we conclude that the trial judge did not err in refusing to instruct the jury as requested by Entergy and that the instructions actually given were correct, adequate, and supported by the evidence. Thus, we do not review the jury’s factual findings de novo. Additionally, we find that the jury’s factual findings which apportioned fault among Entergy (50%), Mr. Searberry (30%), and Oklahoma Gas[2] (20%) to be reasonable *201 and not clearly wrong. We also conclude that the jury did not abuse its considerable discretion in assessing $4,750,000 in general damages to Mr. Scarberry. We do, however, find that the jury’s assessment of special damages for | «¡reduced earning capacity to be clearly wrong and increase the assessment from $300,000 to $1,872,030, the lowest reasonable amount.
Finally, following our de novo review, we find, as a matter of law, that the trial judge incorrectly interpreted and applied the contractual indemnity and hold harmless provision of the mutual assistance agreement. Because the indemnity clause is only triggered when an indemnified party is liable or obligated to a third person on account of loss occasioned in rendering assistance under the contract, the judgment’s carte blanche allocation of Mr. Scarberry’s fault to Entergy is erroneous. On the other hand, the trial judge correctly refused to allocate Oklahoma Gas’s apportioned fault to Entergy because Oklahoma Gas, on account of its statutory immunity, did not have liability up to the full amount of the fault apportioned to it.
Accordingly, we amend the judgment in favor of Mr. Scarberry and against Enter-gy; and affirm the judgment as amended. Mr. Scarberry is entitled to recover from the Entergy defendants 50% of his general and special damages (as amended), or $4,811,015. All amounts are with legal interest from date of demand.
In the Parts which follow, we explain our decision in considerably greater detail.
I
In this Part, we discuss briefly the underlying facts. Hurricane Gustav made landfall on September 1, 2008, resulting in, among other things, a loss of electrical 14power to thousands of Louisiana customers. Shortly thereafter, Entergy and Central Louisiana Electrical Company made requests of other Southeastern Electrical Exchange members to send work crews to Louisiana to assist in the restoration of utility services to affected areas.[3] Oklahoma Gas, a Southeastern Electrical Exchange member, responded to the request by sending several work crews comprised of volunteers, including Mr. Scarberry, in September of 2008. Mr. Scarberry testified that, once they had arrived in Louisiana, the Oklahoma Gas crews performed restoration work for CLECO for seven to eight days before moving on to do similar work for Entergy. The Oklahoma Gas crews then performed restoration work for Entergy in the Baton Rouge area before transferring to the Jennings, Louisiana area for additional restoration work. Mr. Scarberry’s accident occurred on September 14, 2008, in a swampy area near the intersection of Ardoin Cove Road and Ar-doin Cemetery Road. Specifically, Mr. Scarberry was struck with 7600 volts of electricity when he was aiding in an attempt to repair a damaged portion of a downed line.
Contact with the high voltage electricity launched Mr. Scarberry up into the air and then down into a nearby pond. Coworkers pulled Mr. Scarberry from the pond, and he was subsequently taken by air ambulance to Lake Charles Memorial Hospital for treatment. Mr. Scarberry was hospitalized for one month and suffered numerous second and third-degree burns to his arms, chest, feet, and hands resulting in a partial amputation of his left foot, several skin graft operations, and a | Jong, painful recovery. Since the accident, Mr. Scarberry has been diagnosed with several psychological disorders and neurologic injuries — some degenerative. The jury heard testimony from Mr. Scar- *202 berry’s medical witnesses and experts that he is now permanently disabled and that the degenerative nature of his injuries will compel him to be more reliant over time on the care of others.
II
We first address Entergy’s contention that the trial judge erred with respect to the jury charges concerning Entergy’s duty, vel non, to Mr. Scarberry, thus necessitating our de novo review of this matter. Specifically, Entergy argues that a de novo review is mandated by the trial judge’s refusal to read its proffered jury instructions regarding hazards that are open and obvious to all because a downed power line is an open and obvious hazard to all who may encounter it. The trial judge declined to read Entergy’s proposed charge upon the mistaken reasoning that the open and obvious to all defense was no longer good law. Because of this erroneous reasoning, Entergy now asserts that the trial judge’s errors likely contributed to the verdict, thus necessitating a de novo review of the jury’s findings on liability. Entergy further argues that our de novo review of this matter is warranted by the trial judge’s instruction to the jury that Entergy owed Mr. Scarberry a duty of utmost care.
Mr. Scarberry defends the trial judge’s refusal to read the proposed charges because: 1) Entergy failed to raise an open and obvious to all defense in their pleadings; 2) Entergy’s proposed charges misstated the law; 3) the trial judge | (¡instructed the jury that it should presume that a reasonable person should be treated as though they know an electrical line is dangerous; and 4) the evidence presented at trial did not implicate the open and obvious to all defense. Mr. Scar-berry further argues that the trial judge’s utmost care jury instruction was proper because Louisiana law does not recognize a lesser duty based upon the status of the injured plaintiff. Moreover, he notes that the trial judge’s utmost care instruction arises from settled jurisprudence while Entergy cites to no law on this point.
Upon review, we do not find that the trial judge erred in refusing to read Enter-gy’s proposed instructions because the open and obvious to all defense is inapplicable to negligence cases like the present one. Likewise, we do not find that the trial judge’s “utmost care” instruction was erroneous. We now explain our reasoning in greater detail. We first set out Enter-gy’s proposed instructions as well as the challenged utmost care instruction. We then examine briefly the legal contours of the open and obvious to all defense. Following this discussion, we set out the legal standards governing our review of jury charge challenges and then analyze Enter-gy’s challenges in light of these precepts.
A
In this section, we set out the proposed and actual jury charges under review. Entergy proposed three jury charges on the issue of open and obvious hazards. The first proposed instruction provided as follows: “The obviousness and apparentness of a potentially dangerous condition are relevant factors to be considered under the duty-risk analysis. If the facts of a particular case show that 17the complained of condition should be obvious, the condition may not be unreasonably dangerous and the Defendant may owe no duty to the Plaintiff.” In the second proposed instruction, Entergy asked the trial judge to inform the jury that “[a] defendant has no duty to protect against an open and obvious hazard.” Entergy’s third proposed instruction provided: “Where the risk of harm is obvious, universally known, easily avoidable and a part of a natural order in *203 one’s common place surroundings, there is no duty to warn, no duty to prevent, no unreasonable risk or hazard, and no liability based on negligence or strict liability.”
With respect to the “utmost care” instruction, the trial judge stated:
In addition to these general standards, the following specific standards are applicable to the conduct of the defendant. The electric utility that utilizes and maintains high power lines is required to exercise utmost care to reduce hazards to life as far as is practicable. If it should be reasonably anticipated that persons may come into contact with electric lines, the operator of those lines is required to insulate them to give adequate warnings of the danger or to take other proper and reasonable precautions to prevent injury. However, the electric company is not legally bound to safeguard against occurrences that cannot be reasonably expected or contemplated. The operators of the power lines are not required to anticipate each possible accident which may occur and are not the insurers of the safety of persons moving around power lines in the course of everyday living.
Although Entergy’s proposed jury charges cite to supporting cases and accurately reflect statements made in those cases, we note that they fall woefully short of encapsulating the entirety of the law on the open and obvious to all defense. Accordingly, we now set out briefly the legal contours of the open and obvious to all defense.
IsB
In Broussard v. State of Louisiana, Office of State Buildings, 12-1238, p. 10 (La.4/5/13), 113 So.3d 175, 184, the Supreme Court indicated that the issue of whether a condition constitutes an open and obvious hazard is properly raised in connection with the risk-utility analysis employed in deciding whether an owner of a thing is responsible for injuries caused by a hazardous condition or defective component. The plaintiff in Broussard suffered injuries as a result of an accident caused by a malfunctioning, misaligned elevator and brought suit against the building’s owner. The plaintiff premised his case on the theory that the building’s owner was liable for failing to properly maintain and repair a defective thing within its custody, thus creating an unreasonable risk of harm. The jury found in favor of the plaintiff, but the court of appeal reversed after concluding that the jury’s unreasonable risk of harm conclusion was manifestly erroneous. See Broussard v. State ex. Rel. Office of State Bldgs., unpub., 11-0479 (La.App. 1 Cir. 3/30/12), 2012 WL 1079182. The First Circuit concluded, among other things, that the elevator’s defect was open and obvious, and thus did not present a serious risk of harm. The Louisiana Supreme Court granted writs, reversed the First Circuit, reinstated the District Court’s judgment, and discussed the open and obvious to all defense.
The Supreme Court first observed that the plaintiffs claims must be analyzed under La. Civil Code arts. 2317 and 2322, which concern liability for damages caused by things and buildings in one’s custody, because the elevator is a 19component part of the building.[4] The Supreme Court then noted that owners of buildings are respon *204 sible only for those injuries caused by ruinous conditions or defective component parts that present an unreasonable risk of harm to others. See Broussard, 12-1238, p. 9, 113 So.3d at 183. The Supreme Court further noted that the question of whether a defect presents an unreasonable risk of harm is a disputed issue of mixed fact and law or policy that is peculiarly a question for the jury or trier of the fact to decide. Id. Thus, “whether a defect presents an unreasonable risk of harm is ‘a matter wed to the facts’ and must be determined in light of facts and circumstances of each particular case.” Id.
Accordingly, the Supreme Court has “adopted a risk-utility balancing test, wherein the fact-finder must balance the gravity and risk of harm against individual societal rights and obligations, the social utility of the thing, and the cost and feasibility of repair.” Broussard, 12-1238, pp. 9-10, 113 So.3d at 184. The risk-utility balancing test is comprised of four pertinent factors: 1) the utility of the complained-of condition; 2) the likelihood and magnitude of harm, including the obviousness and apparentness of the condition; 3) the cost of preventing the harm; and 4) the nature of the plaintiffs activities in terms of its social utility or whether it is dangerous by nature. See Broussard, 12-1238, p. 10, 113 So.3d at 184.
1 1flThe open and obvious to all issue, therefore, is considered under the second prong of the risk-utility inquiry under La. Civil Code art. 2322. Under Louisiana law, a defendant generally does not have a duty to protect against an open and obvious hazard. See, e.g., Hutchinson v. Knights of Columbus, Council No. 5747, 03-1533, p. 9 (La.2/20/04), 866 So.2d 228, 234. In order for a hazard to be considered open and obvious, the Supreme Court has consistently stated the hazard should be one that is open and obvious to all, i.e., everyone who may potentially encounter it. See, Murray v. Ramada Inns, Inc., 521 So.2d 1123, 1136 (La.1988) (“[A] potentially dangerous condition that should be obvious to all comers is not, in all instances, unreasonably dangerous.”). In Broussard, the Supreme Court acknowledged those critics, like the trial judge in this case, who assert that the “open and obvious” argument suggests a disguised application of contributory negligence or assumption of the risk doctrines, by observing that, “when the risk is open and obvious to everyone, the probability of injury is low and the thing’s utility may outweigh the risks caused by its defective condition.” 12-1238, pp. 10-11, 113 So.3d at 184. The Court further observed that the open and obvious to all issue, unlike assumption of the risk doctrine, “focuses on the global knowledge of everyone who encounters the defective thing or dangerous condition, not the victim’s actual or potentially ascertainable knowledge.” Broussard, 12-1238, p. 18, 113 So.3d at 188.
The jurisprudence, accordingly, provides that if the facts and circumstances of a particular case show a dangerous condition that should be open and obvious to | nail who encounter it, then the condition may not be unreasonably dangerous and the defendant may owe no duty to the plaintiff. See, e.g., Jimenez v. Omni Royal Orleans Hotel, 10-1647 (La.App. 4 Cir. 5/18/11), 66 So.3d 528. The Supreme Court has nevertheless cautioned that courts should not tether the legal existence of a duty to the factual determination of *205 whether a risk is reasonable, thus conflating the open and obvious to all doctrine with the duty and breach elements of Louisiana’s negligence analysis. Rather, the Court indicated that in “order to avoid further overlap between the jury’s role as fact-finder and the judge’s role as lawgiver, we find the analytic framework for evaluating an unreasonable risk of harm is properly classified as a determination of whether a defendant breached a duty owed, rather than a determination of whether a duty is owed ab initio.” Broussard, 12-1238, pp. 11-12, 113 So.3d at 185. Accordingly, while a defendant under La. Civil Code art. 2322 only has a duty to protect against unreasonable risks that are neither obvious nor apparent, “the fact-finder, employing a risk-utility balancing test, determines which risks are unreasonable and whether those risks pose an open and obvious hazard.” Broussard, 12-1238, p. 12, 113 So.3d at 185. That is to say, “the fact-finder determines whether [a] defendant has breached a duty to keep its property in a reasonably safe condition by failing to discover, obviate, or warn of a defect that presents an unreasonable risk of harm.” Broussard, 12-1238, pp. 12-13, 113 So.3d at 185.
I12C
In this section, we set out the standard governing challenges to jury instructions. “A trial judge has a duty to give instructions which properly reflect the law applicable in light of the facts of the particular case.... In order to fulfill that duty, he must both require that the jury consider only the correct law and avoid confusing the jury.” Burns v. CLK Investments V, L.L.C., 10-0277, pp. 8-9 (La.App. 4 Cir. 9/1/10), 45 So.3d 1152, 1158, citing Guidry v. Bank of LaPlace, 94-1758, p. 3 (La.App. 4 Cir. 9/15/95), 661 So.2d 1052, 1055 (ellipsis indicates citation omitted). A trial judge, however, “is under no obligation to give any specific jury instructions that may be submitted by either party; he must, however, correctly charge the jury.” Burns, 10-0277, p. 9, 45 So.3d at 1058. An appellate court must exercise great restraint before overturning a jury verdict on the suggestion that the instructions were so erroneous as to be prejudicial. Id. See also Maraist, 1 La. Civ. Law Treatise, Civil Procedure, § 11.10 (2d ed.).
Bums requires that, in addition to finding an erroneous jury instruction, we must also find that the instruction “likely contributed to the verdict before we engage in a de novo review of the jury’s verdict.” 10-0277, p. 9, 45 So.3d at 1158. Only after we find that an instruction was erroneous and that it likely contributed to the verdict are we authorized to review the facts of a case de novo. See Adams v. Rhodia, Inc., 07-2110, p. 7 (La.5/21/08), 983 So.2d 798, 805.
I13D
We do not find that the trial judge’s refusal in this case to instruct the jury as to the open and obvious to all defense was erroneous because this specific inquiry was inapplicable to the issues to be resolved by the jury. The record shows that Mr. Scarberry grounded his case to the jury on the assertion that Entergy’s employees breached duties of care owed to him, thus rendering Entergy vicariously liable in part for his injuries. Indeed, the trial judge did not read instructions concerning strict liability, liability for hazardous things under one’s control, or the duty to warn of hazardous things. Moreover, the jury was not asked via interrogatories to determine whether the electrical line that struck Mr. Scarber-ry was defective and/or created an unreasonable risk of harm. Rather, the jury was asked to determine whether Entergy *206 was negligent and whether such negligence was a cause-in-fact of Mr. Scarber-ry’s injuries. Clearly, the questions before the jury did not implicate any potential liability that Entergy might have for things in its custody. Although it is true that the trial judge grounded its refusal to read Entergy’s proposed charge on a misreading of the law, it is equally true that we review judgments and rulings rather than underlying reasons. See Doe v. Louisiana Bd. of Ethics, 12-1169, p. 3 (La.App. 4 Cir. 3/13/13), 112 So.3d 339, 342 n. 3. In this case, the trial judge’s refusal to instruct the jury as to Louisiana’s open and obvious to all inquiry was correct because it was inapplicable to the issues to be resolved by the jury.[5]
114Similarly, we find that the trial judge did not err when he instructed the jury that Entergy owed a duty to Mr. Scarberry of utmost care. Entergy argues that the trial judge’s “utmost care” instruction was erroneous because it does not apply to an electrical worker, like Mr. Scarberry, under these circumstances. We do not agree. The record indicates that the trial judge’s “utmost care” instruction was based on lánguage found in Simon v. Southwest Louisiana Electric Membership Corp., 390 So.2d 1265 (La.1980), and Hanks v. Entergy Corp., 06-477 (La.12/18/06), 944 So.2d 564. In Simon, the Supreme Court was confronted with several consolidated wrongful death suits that arose from an incident where several men were electrocuted when a pipe used in the drilling of a water well touched a high voltage electric line owned by the defendant utility company. In discussing the utility company’s duty, the Court recognized that “electric companies who utilize and maintain high power lines are required to exercise the utmost care to reduce hazards to life as far as is practicable.” Simon, 390 So.2d at 1267. It was also noted that, if a utility company reasonably anticipates “that persons may come into contact with electric lines, the operator of those lines is required to insulate them, or to give adequate warning of the danger, or to take other proper and reasonable precautions to prevent injury.” Id. The Supreme Court also recognized, however, that an “electric company is not legally bound to safeguard against occurrences that cannot be reasonably expected or contemplated.” Id. |15Thus, it also observed that “operators of power lines are not required to anticipate every possible accident which may occur and are not the insurers of safety of persons moving around power lines in the course of everyday living.” Simon, 390 So.2d at 1268.
In Hanks, homeowners and their insurer sued an electric utility seeking to recover damages to their home that resulted from a fire caused by a lightning strike on a line running to the home. In discussing the duty aspect of the plaintiffs’ negligence cause of action, the Supreme Court noted that it is “well established [that] Louisiana courts require a high duty of care by those dealing in the manufacture and distribution of electricity.” Hanks, 06-477, p. 21, 944 So.2d at 579. The Supreme Court, accordingly, stated that electric transmission companies, “which maintain and employ high power lines, are required to exercise the utmost care to reduce hazards to life as far as practicable, provided the *207 utility is not required to guard against situations, which cannot reasonably be expected or contemplated.” Id.
Entergy cites to no case, and our own research has found none, in support of its argument that it owes a lesser standard of duty to Mr. Searberry under the present circumstances. Rather, we note that Entergy’s assertion, if accepted, would lead to a reintroduction of the “assumption of.the risk” doctrine into the duty/risk analysis. In essence, Entergy’s argument seeks to define a defendant’s duty in terms of a given plaintiffs actual knowledge. To the contrary, a “defendant’s duty should not turn on a particular plaintiffs state of mind, but instead should be 11fidetermined by the standard of care which the defendant owes to all potential plaintiffs.” Murray, 521 So.2d at 1136. Clearly, the trial judge’s “utmost care” instruction was not erroneous.
Accordingly, a de novo review of this matter would be inappropriate given that the trial judge did not err with respect to jury charges.
Ill
In this Part, we address the parties’ challenges to various aspects of the jury’s verdict. Specifically, Entergy challenges the jury’s allocation of fault and its assessment of general damages. On the other hand, Mr. Searberry challenges the jury’s assessment of damages for his loss of earning capacity. Before turning to these respective assignments of error, we first set out the legal precepts governing this case.
A
In civil cases, we apply the manifest error standard of review to the trier of fact’s factual findings. See Hall v. Folger Coffee Co., 03-1734, p. 9 (La.4/14/04), 874 So.2d 90, 98. In order to reverse the findings of a trier of fact, “an appellate court must undertake a two-part inquiry: 1) the court must find from the record that a reasonable factual basis does not exist for the finding of the trier of fact; and 2) the court must further determine that the record establishes the finding is clearly wrong.” Harold A. Asher, CPA, LLC v. Haik, 12-0771, p. 4 (La.App. 4 Cir. 4/10/13), 116 So.3d 720, 723-724. When there are two permissible views of the evidence, the trier of fact’s choice between them cannot be manifestly erroneous. See Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). The manifest error standard of review also applies to mixed questions of law and fact. See Brasseaux v. Town of Mamou, 99-1584, pp. 7-8 (La.1/19/00), 752 So.2d 815, 820-821.
B
Entergy assigns as error the percentages of fault allocated by the jury to the two Entergy companies. The jury, specifically, assigned a total of fifty percent of the fault to the two Entergy companies, twenty percent of the fault to Oklahoma Gas, and thirty percent of fault to Mr. Searberry.[6] Entergy contends that the jury’s finding of liability should be reversed because of a lack of evidence in the record showing that it deviated from any applicable standard of care. Alternatively, Entergy argues that its percentage of the fault should be reduced to no more than ten percent because the record shows that *208 the overwhelming degree of fault lies with Mr. Scarberry and Oklahoma Gas. We disagree and affirm the jury’s verdict. We first set out the law applicable to the review of comparative fault allocations. We then examine in more detail the facts of this case. Finally, we analyze the jury’s allocation of fault in light of the law and the facts.
1
Louisiana Civil Code art. 2328 A provides:
In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, |isand regardless of the person’s insolvency, ability to pay, immunity by statute, including but not limited to the provisions of [La.] R.S. 23:1032, or that the other person’s identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.
Whether comparative fault under La. Civil Code art. 2323 applies in a given case is a factual determination governed by the manifest error standard of review; hence, “[o]nly if the apportionment of fault is found to be clearly wrong can an appellate court adjust percentages.” Ambrose v. McLaney, 06-1181, p. 10 (La.App. 4 Cir. 5/16/07), 959 So.2d 529, 536.
The Louisiana Supreme Court has admonished that “allocation of fault is not an exact science, or the search for one precise ratio, but rather an acceptable range, and that any allocation by the fact finder within that range cannot be ‘clearly wrong.’ ” Foley v. Entergy Louisiana, Inc., 06-0983, p. 32 (La.11/29/06), 946 So.2d 144, 166. The same principles that apply to a quantum assessment apply to a fault allocation. Only after determining that the fault allocation is manifestly erroneous can an appellate court disturb the award, and then only to lower or raise it to the highest or lowest point, respectively, reasonably within the trial court’s discretion. See Watters v. Department of Social Services, 08-0977, p. 38 (La.App. 4 Cir. 6/17/09), 15 So.3d 1128, 1155.
2
Here we examine, in more detail, the facts of this matter. Mr. Scarberry testified that he travelled to Louisiana in September of 2008 as part of the | ^Oklahoma Gas contingent. Mr. Scarberry, who had worked in a number of roles during his nearly thirty-year tenure with Oklahoma Gas, was tasked with providing support for the work crews: “I was looking at job sites ahead of the crews, getting the materials they needed, feeding them, working on hotel rooms, things of that nature.”
When they arrived in Louisiana, the Oklahoma Gas crews first performed restoration work for CLECO for seven to eight days. After assisting CLECO, the Oklahoma Gas crews travelled to Baton Rouge for a safety and operations orientation meeting that was put on by Entergy. Significantly, the Entergy safety session covered proper grounding practices. The Oklahoma Gas crews then performed restoration work for Entergy in the Baton Rouge area before transferring to the Jennings, Louisiana, area for additional restoration work. Mr. Scarberry’s accident occurred on September 14, 2008, one day *209 after the Oklahoma Gas crews arrived in Jennings, Louisiana.
Mr. Scarberry testified that, on the day of the accident, the Oklahoma Gas crews first met at the Entergy office in Jennings, Louisiana. Larry Moore, an Entergy employee, was tasked with leading the Oklahoma Gas crew to the various jobsites.[7] After performing some restoration work in Jennings, Mr. Moore then split the Oklahoma Gas crew up into smaller contingents and took them out into the surrounding countryside for further restoration work. After lunch, Mr. Moore |aninformed Mr. Scarberry’s group that their next job would be to restore a downed line in a swampy area near Bayou Lacassigne.
Mr. Scarberry testified that he first arrived at the scene to find Mr. Moore and a contingent of Oklahoma Gas workers already on the job. Mr. Moore was sitting in his Entergy truck, parked on Ardoin Cove Road near its intersection with Ar-doin Cemetery Road, while the Oklahoma Gas crew was at the restoration site farther to the south on Ardoin Cemetery Road. The specific downed line was tied into, and thus received its power from, a line running parallel to Ardoin Cove Road. From its junction at a point on Ardoin Cove Road west of its intersection with Ardoin Cemetery Road, this particular line runs south, across farmland, and then to the east, through swampy woodlands, before intersecting Ardoin Cemetery Road. This line is protected by a fuse at its point of origin on Ardoin Cove Road. Because of distance and the intervening forest, the fuse could not be seen from the site of the accident, although Mr. Moore could see it from his Entergy truck.
Upon his arrival at the scene, Mr. Scar-berry passed Mr. Moore, who was sitting in his Entergy truck near the intersection of the two roads. Mr. Scarberry then turned south on Ardoin Cemetery Road to meet up with the remainder of the Oklahoma Gas crew. Mr. Scarberry testified that the downed line was in a wet, muddy area near a pond and a stream that had overflowed its banks. Mr. Scarberry further testified that the site was littered with downed trees, tree limbs, and clogged with dense brush. Accordingly, Mr. Scarberry traveled back up Ardoin Cemetery Road to meet with Mr. Moore in an attempt to secure a brush cleaning crew. |2i While waiting to hear back from Entergy, Mr. Scarberry noticed the fuse pole that served as the connecting point between the two lines. Significantly, Mr. Scarberry noticed that the line leading to the downed section had yet to be grounded. According to Mr. Scarberry, Mr. Moore offered to help out by grounding the line. After Mr. Moore found out that no brush cleaning crews were available, Mr. Scarberry returned to his co-workers.
Upon returning to the work site, Mr. Scarberry took a chainsaw and a set of pruning shears and began to clear brush. Mr. Scarberry stated that he first followed the line through the woods and fields back up to its point of origin near Ardoin Cove Road. He noted that he tested the line as he went and found that it was de-ener-gized. Before he began to clear the brush, he again noticed that the line being repaired had still not been grounded. Accordingly, Mr. Scarberry testified that he placed an Oklahoma Gas danger tag on a fence next to the pole in order to warn other workers that this particular line was being worked on. Mr. Scarberry then be *210 gan clearing brush as he worked his way-south towards the Oklahoma Gas crew. Upon meeting up with the remainder of his crew, Mr. Scarberry was asked whether the line had been grounded. He then walked back-up Ardoin Cemetery Road to meet Mr. Moore. Mr. Scarberry testified that he asked Mr. Moore to watch the fuse pole because it had yet to be grounded. He then walked back to his crew and took a break.
While resting, Mr. Scarberry watched his co-workers raise the downed line. As it was going up, Mr. Scarberry noticed a bad spot in the line that had yet to be 122repaired. Mr. Scarberry notified his coworkers about the condition and went back to his break. Mr. Scarberry then looked up Ardoin Cemetery Road to see. Mr. Moore.walking around his truck on Ardoin Cove Road. Mr. Scarberry testified that he observed Mr. Moore point towards the working Oklahoma Gas crew. He then observed several other Oklahoma Gas trucks park on Ardoin Cove Road near Mr. Moore’s truck. Mr. Scarberry then saw Mr. Moore walk down Ardoin Cove Road towards the location of the fuse pole that protected the line under repair. Mr. Scarberry then lost sight of Mr. Moore as his attention turned back towards the line under repair.
Two members of the other Oklahoma Gas crew, Jeremy Mullins and John Joseph Printup, testified at trial. Both testified that, after the Oklahoma Gas contingent had been split up into smaller groups by Mr. Moore, theirs left to also perform restoration work in the countryside near Jennings. While this contingent was trav-elling along Ardoin Cove Road to a job, they came across the fuse pole near the intersection with Ardoin Cemetery Road. Both men testified that they could see that the fuse had blown. Jeremy Mullins then contacted their immediate supervisor on the radio to ask for permission to close the fuse. Mr. Printup testified that he heard his supervisor state: “Look it over careful before you do anything and if everything looks good you can close it.” Mr. Mullins testified that he examined the pole and fuse in question and found that the fuse was open, but saw no pole wrap, grounding wire, or danger tag on the pole or the fuse. Mr. Mullins also testified that pole wrap and danger tags are employed to alert other Inutility workers to the fact that a given line is being worked on. Mr. Print-up, furthermore, did not testify to seeing a grounding line on the pole in question. Unfortunately, Mr. Mullins mistakenly thought that the line leading from the pole fed several nearby houses instead of running south into the woods to where Mr. Scarberry’s crew was working. Mr. Mullins then closed the fuse, thereby re-energizing the line without the knowledge of the men working on it farther down Ar-doin Cemetery Road.
Meanwhile, Mr. Scarberry was watching the repair of the line near the pond adjacent to Ardoin Cemetery Road. Mr. Scar-berry testified that he saw Brandon Smith, another Oklahoma Gas crew member, near the bad portion of the line, walked over to him, and learned that he had been tasked with repairing the line. Mr. Scarberry then told Mr. Smith that, while he had previously tested the line and found it dead, he did not know whether the line had been grounded. Before Mr. Smith could begin repairing the line, Mr. Scar-berry testified to hearing a loud scream, whereupon he turned around and saw Mr. Smith glowing and emitting sparks. The wire then fell from Mr. Smith’s hand, and he collapsed in a crouched position over the live wire. Mr. Scarberry testified to seeing the line begin to jump up. Fearing that wire would harm Mr. Smith even more, Mr. Scarberry pushed him out of *211 harm’s way only to have the energized line jump up and strike him in the chest.
Mr. Smith testified at trial to a different version of events. Mr. Smith stated that he had been working on the downed portion of the line near its intersection]^with Ardoin Cemetery Road. Mr. Smith, like Mr. Scarberry, also testified that Scarber-ry noticed a bad spot in the line as it was being raised. Mr. Smith, however, stated that Mr. Scarberry did not sit and watch the repairs but instead offered to fix the bad spot in the line. Mr. Scarberry asked Mr. Smith to help by gathering his tools and repair supplies. Mr. Smith testified that, after delivering the items, he watched Mr. Scarberry cut into the line only to see the line “heat up.” Mr. Smith testified that, at the time the line re-energized, Mr. Scarberry was holding the line with his left hand even though he was not wearing rubber gloves. Even though he denied being in contact with the line, Mr. Smith was struck by the electricity. Although he suffered a loss of consciousness, Mr. Smith’s injuries were limited to blisters and minor burns.[8]
3
We now analyze Entergy’s assertion that the jury erred in its allocation of fault, necessitating a reduction of Enter-gy’s percentage of fault to no more than ten percent. Mr. Scarberry argued to the jury that Entergy was vicariously liable for his damages because its employee, Larry Moore, failed in his duty to take responsibility for the safety of the workers, like Mr. Scarberry, who were under his authority. Specifically, Mr. Scarberry asserted that Mr. Moore’s duty derived from his status as an Entergy Circuit Boss and Crew Leader. These two designations derive from Entergy post-storm restoration protocols, and each obligates a designee to adhere to certain safety rules. At trial, Entergy argued that Mr. Moore 125was not a Circuit Boss because he and the Oklahoma Gas crew were not working on trunk feeders.[9] Indeed, Mr. Moore testified that on September 14, 2008, he was of the opinion that he was a mere Crew Guide — an individual that leads work crews to work sites and bears no responsibility for the safety of the other workers. However, prior to trial, Entergy admitted via answers to interrogatories that “Larry Moore was the Feeder Boss/Circuit Boss working with the Oklahoma Gas crew on September 14, 2008, and that he was also performing some of the functions of a Crew Leader.”[10]
Entergy documents define Circuit Boss as an “individual in charge of de-energized *212 trunk feeders from an open point to a certain downstream [sic ] open point in the field during emergency storm restoration.” Entergy documents further explain that the Circuit Boss designation was created in response to difficulties encountered in the aftermath of Hurricanes Katrina and Rita when poor communications “jeopardized the safety of restoration crews as well as slowing the restoration process.” Thus, the Circuit Boss position was created to enhance field communications and improve the level of coordination and management of ^restoration work. Entergy calls this responsibility “Controlling Authority,” which is defined as “authorization to monitor and manage operations of an assigned area.” Entergy documents indicate that this authority includes the responsibility of ensuring that safety procedures are followed in the course of field work.
In fact, Entergy’s Circuit Boss training documents indicate that the “safety of all restoration personnel is our primary concern.” Thus, a Circuit Boss is obligated to take “responsibility for the safety of all line, vegetation, damage assessment, meter services and other personnel on your circuit(s).” (Emphasis in original). Moreover, Entergy’s Circuit Boss training documents also state clearly that all “line and vegetation personnel must work electrical conductors as energized unless they have been tested to be de-energized and properly grounded.” Individuals with Controlling Authority are also responsible for issuing clearance orders.
Entergy’s Emergency Response Orientation Handbook indicates that, prior “to any de-energized work being performed on electric lines or equipment, a clearance must be obtained from the Controlling Authority.” Entergy documentation provides that a clearance order, among other things, “is given to assure personnel that a piece of equipment or line section has been de-energized.” Circuit Bosses are also responsible for filling out Entergy hold tags, which are then placed on utility poles with lines that are under repair to notify and warn others that the line should not be re-energized without the permission of the individual holding Controlling Authority.
li>7Unlike a Circuit Boss, a Crew Leader is “an individual in charge of line and vegetation crews engaged in emergency storm restoration.” Entergy training materials indicate that the Crew Leader position was created to ensure that all restoration personnel, including those from other Southeastern Electrical Exchange members, assess and mitigate all risk, and perform all work in a safe manner. Moreover, a Crew Leader is obligated to “stay engaged with the crews throughout the restoration period so that he/she can become familiar with the crew’s work habits, focus on safety, and the general job performance.” A Crew Leader is also obligated to contact Entergy’s Distribution Operations Center “as soon as possible” whenever any circuit is energized. Enter-gy’s training documents also indicate that, among other things, a Crew Leader is supposed to hold a “tailboard conference” with his workers before starting any job, identify the necessary steps to finish a project, and pinpoint potential hazards associated with a project, and decide which steps need to be taken to minimize the hazards. Additionally, Entergy’s Crew Leader training documents repeatedly stress the importance of proper grounding practices and indicate that the “person in charge of the work at the site shall assure that proper grounding has been accomplished prior to beginning work.”
The facts adduced at trial indicate that Mr. Moore initially told Mr. Scarberry and his co-workers that the line leading from Ardoin Cove Road into the woods was *213 dead and de-energized. After Mr. Scar-berry and his co-workers began repairing the line, Mr. Moore stationed his pickup truck at the intersection of Ardoin Cove Road and Ardoin Cemetery Road in order to watch for other | ^Oklahoma Gas workers who were headed towards the area. Mr. Moore testified that he did not ground the line under repair, place a hold tag on the blown fuse, place pole wrap on the pole holding the fuse, initiate a tailboard conference, or fill out the appropriate clearance order forms to ensure that proper procedures had been followed.
Additionally, J. Bradley Shepherd, Mr. Scarberry’s expert in electric utility industry standards and practices opined that Entergy’s failure to properly de-energize the line under repair resulted in an unsafe workplace. Specifically, Mr. Shepherd testified that Mr. Moore, in his role as Circuit Boss/Crew Leader, failed to: 1) follow the appropriate procedures prior to declaring the line energized; 2) install En-tergy’s hold tag; 3) pull the fuse and install pole wrap; 4) install grounds on the pole at issue; and 5) hold a tailboard conference prior to starting work. Mr. Shepherd also testified that Entergy: 1) overstretched Mr. Moore; 2) failed to inform Mr. Moore that he was a Circuit Boss/ Crew Leader; and 3) failed to train Mr. Moore as to the duties and responsibilities of Circuit Bosses and Crew Leaders.
Clearly, the jury was presented with competent evidence from Mr. Scarberry in support of his contention that Mr. Moore was a Circuit Boss/Crew Leader and that Mr. Moore and Entergy were both negligent and responsible for his injuries. Upon a careful review of the record, and after having discussed the facts at length over the course of this opinion, we find that the jury’s findings as to the allocation 129of fault are reasonable and were not clearly wrong. Accordingly, Entergy’s assignment of error on this point is without merit.
IV
In this Part, we examine Entergy’s contention that the jury abused its discretion in its assessment of general damages. We begin by first setting out the law governing the review of general damage awards. We then examine the jury’s assessment of general damages and the relevant, underlying medical facts.
A
It is well-settled that a jury is given great discretion in its assessment of general damages. See Louisiana Civil Code art. 2324.1. (“In the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury.”). Furthermore, the assessment of quantum, or the appropriate amount of damages, by a trial judge or jury is a determination of fact, one entitled to great deference on review. See Wainwright v. Fontenot, 00-0492, p. 6 (La.10/17/00), 774 So.2d 70, 74. Because the discretion vested in the trier of fact is so great, and even vast, an appellate court should rarely disturb an assessment of general damages on review. See Youn v. Maritime Overseas Corp., et al., 623 So.2d 1257, 1261 (La.1993).
Our role as an appellate court in reviewing a general damages award, one which may not be fixed with pecuniary exactitude, is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact. See Duncan v. Bartholomew, 11-0855, p. 9 (La.App. 4 Cir. 3/14/12), 88 So.3d 698, 707. We have long held true to the following principles: “[b]efore a Court of Appeal can disturb an award made by a [fact finder,] the record must clearly reveal that the trier of fact abused its discretion *214 in making its award. Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court.” Wainwright, 00-0492, p. 6, 774 So.2d at 74. Reasonable persons frequently disagree about the measure of damages in a particular case. “It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award.” Youn, 623 So.2d at 1261.
B
Entergy asserts that the jury’s assessment of $4,750,000 in general damages constitutes an abuse of discretion which must be reversed or reduced to, at most, $1,000,000. The jury, according to Entergy, abused its discretion because the evidence adduced at trial showed that Mr. Searberr/s injuries were “unfortunate but not catastrophic.” In support, Entergy references several pictures of Mr. Scarber-ry engaging in such activities as socializing with friends, bicycling, and horseback riding that were posted on his wife’s Face-book page between July and October 2010.
| ci, Mr. Scarberry, however, presented a different account to the jury. Mr. Scarber-ry testified to feeling searing pain and smelling his own burning flesh as he was struck with 7600 volts of electricity. Mr. Scarberry also told the jury about how he saw a “white light” and had what is commonly referred to as a “near death experience” before being pulled from the pond. Mr. Scarberry stated that he was fearful of drowning and shocked at the sight of his badly burned hands and feet after being pulled from the pond.
Mr. Scarberry suffered numerous second and third-degree burns to his arms, chest, feet, and hands resulting in a partial amputation of his left foot and several painful skin graft operations. Mr. Scar-berry was hospitalized for one month, although his wounds took much longer to heal, and his feet remained swollen for three to four months after leaving the hospital.
Since the accident, Mr. Scarberry has been diagnosed with a traumatic brain injury and a delayed-onset neurological syndrome with symptoms similar to amy-trophic lateral sclerosis, or Lou Gehrig’s disease. One of Mr. Scarberry’s medical witnesses, a board certified neurosurgeon, testified that common symptoms of ALS include severe muscle spasms. Mr. Scar-berry, specifically, testified to suffering from hours-long, debilitating muscle seizures and spasms. Mr. Scarberry also testified that his seizures result in him falling six to seven times per month. Initially, the seizures were more frequent and lasted longer, resulting in numerous trips to the local Emergency Room. However, Mr. Scarberry has since L?been placed on a daily regimen of anti-seizure medications that have reduced the number of seizures to approximately three to six times per week.
Because his neurological syndrome is slowly degenerative, Mr. Scarberry will become increasingly dependent upon others for his basic care and hygienic needs. For example, Mr. Scarberry testified that he is now reliant upon his wife to help him shave, wash his hair, brush his teeth, button his shirts, and cut up his food. In fact, Mr. Scarberry testified that he is no longer able to clean himself after having gone to the bathroom, but instead must rely upon his wife for help.
*215 Additionally, Mr. Scarberry has been diagnosed with post-traumatic stress disorder, major depressive disorder, pain disorder, and undifferentiated somatoform disorder. Mr. Scarberry testified that he has sought mental counseling since the accident and that his injuries have left him embarrassed and depressed at his growing loss of independence. Mrs. Scarber-ry’s testimony echoed her husband’s on this point. Mr. Scarberry’s treating physician linked these disorders to the accident and testified that Mr. Scarberry is totally disabled. Mr. Scarberry’s expert psychiatrist testified that these conditions would plague Mr. Scarberry for the remainder of his life and opined that he is seventy percent permanently disabled as a result of his mental illnesses.
Significantly, Entergy presented no medical testimony to dispute Mr. Scarber-ry’s claims regarding his injuries. Rather, Entergy tethered its arguments to those photographs of Mr. Scarberry, taken prior to October 2010, in which he is seen socializing and riding bicycles and horses. When presented with these ] ^photographs, however, none of Mr. Scarberry’s medical witnesses altered their opinions about Mr. Scarberry’s conditions or future prospects. On the other hand, Dr. Anthony Haddad, Mr. Scarberry’s treating physician, testified that he recommended that Mr. Scar-berry take up bicycle riding in the days after his initial recuperation because he could no longer walk for long distances. Similarly, Mr. Scarberry’s therapist, Pam Holt, testified that she encouraged Mr. Scarberry, who has a long-standing love of horses, to continue horseback riding as treatment for his mental illnesses. Since the photos were taken, Mr. Scarberry can no longer ride horses without the assistance of others. Further, Mr. Scarberry has likewise lost the ability to ride a bicy-ele, and Dr. Haddad has prescribed a wheelchair for Mr. Scarberry. Both Dr. Haddad and Dr. Smith, Mr. Scarberry’s expert neurosurgeon, testified that Mr. Scarberry will eventually require 24 hour attendant care because of the electrical injury.
Having reviewed the testimony and the evidence, we cannot say that the jury abused its discretion in assessing Mr. Scarberry general damages at $4,750,000.[11]
Y
We now turn to address Mr. Scarberry’s assertion that the jury erred by failing to sufficiently compensate him for his loss of earning capacity. Mr. Scarberry argued to the jury that his loss of earning capacity should be valued at $1,872,030. The jury, however, assessed this item of damage at $300,000. Mr. Scarberry asserts that the jury abused its discretion on this issue because he | ^presented uncontradicted expert testimony from medical witnesses to establish the fact that he was disabled, and from an expert economist to establish the amount of his loss of earning capacity. Entergy presented no contradicting evidence, but instead points to pictures from Mrs. Scarberry’s Facebook page to support its argument that the accident had no long-term effect on his life. Further, En-tergy contends that the jury’s assessment was not an abuse of discretion because Mr. Scarberry voluntarily took retirement from Oklahoma Gas in 2010. Having reviewed the record, we find that the jury’s assessment of $300,000 was manifestly erroneous.
A
In this section, we discuss the law governing loss of earning capacity claims *216 ■and the review of special damage assessments. An award for lost earning capacity is not merely predicated upon the difference between a plaintiffs actual earnings before and after a disabling injury, but upon the difference between a plaintiffs earning capacity before and after an injury. See Buffinet v. Plaquemines Parish Com’n Council, 93-0840, p. 21 (La.App. 4 Cir. 7/27/94), 645 So.2d 631, 644. As we explained in Dunomes v. Plaquemines Parish Government:
The law allows not merely for loss of future earnings, but rather for loss of earning capacity. It is well known that under present economic conditions and under the current insurance rates paid by employers, employers will not hire a person with physical disabilities, other than under federally subsidized programs for the hiring of the handicapped, for fear of increases in their insurance. The existence of the injury places plaintiff at a distinct disadvantage in the marketplace of job competition. Likewise the earning capacity loss for which plaintiff is compensated is not loss of future earnings, but is lost future earning capacity. Plaintiff was in his chosen profession at the time of the accident. He is compensated for the loss of that profession. If | ^plaintiff is able to compensate for his injury by retraining himself to engage in another profession, he is not penalized by his efforts to do so, but rather is still awarded damages for the lost profession.[12]
09-0570, p. 8 (La.App. 4 Cir. 10/21/09), 24 So.3d 242, 248.
The Louisiana Supreme Court in Folse v. Fakouri defined the claim as follows: “What plaintiff earned before and after the injury does not constitute the measure. Even if he had been unemployed at the time of the injury he is entitled to an award for impairment or diminution of earning power. And while his earning capacity at the time of the injury is relevant, it is not necessarily determinative of his future ability to earn. Damages should be estimated on the injured person’s ability to earn money, rather than what he actually earned before the injury.” 371 So.2d 1120, 1123 (La.1979) (citations omitted). In other words, the “theory is that the injury done him has deprived him of a capacity he would have been entitled to enjoy even though he never profited from it monetarily.” Folse, 371 So.2d at 1124.
An award for loss of earning capacity requires only the presentation of “medical evidence which indicates with reasonable certainty that there exists a residual disability causally related to the accident” at issue. Aisole v. Dean, 574 So.2d 1248, 1252 (La.1991). “This medical evidence may be corroborated and complemented by lay testimony including that of the plaintiff.” Updegraff v. State ex rel. Dept. of Transp. & Dev., 01-1048, p. 15 (La.App. 4 Cir. 10/2/02) 828 So.2d 693, 704. Loss of earning capacity awards are “inherently speculative and intrinsically insusceptible of being calculated with mathematical certainty.” Rathey v. Priority EMS, Inc., 04-0199, p. 51 (La.App. 4 Cir. 1/12/05), 894 So.2d 438, 471, citing Myers v. Burger King Corp., 92-0400, p. 14 (La.App. 4 Cir. 5/26/94), 638 So.2d 369, 379.
Such an award, however, is considered an item of special damages. See Moffitt v. Sewerage & Water Board of New Orleans, 09-1596, pp. 18-19 (La.App. 4 Cir. 5/19/10), 40 So.3d 336, 347. An appellate court, in reviewing a jury’s factual conclusions with regard to special damages, must satisfy a two-step process *217 based on the record as a whole: there must be no reasonable factual basis for the trial court’s conclusions, and the finding must be clearly wrong. See Kaiser v. Hardin, 06-2092, pp. 11-12 (La.4/11/07), 958 So.2d 802, 810.
A forensic economist is generally necessary to make those calculations necessary to establish a loss of earning capacity claim. See Rogers v. State ex rel. Dept. of Transp. and Development, 00-1424, pp. 14-15 (La.App. 4 Cir. 3/7/02), 813 So.2d 495, 506. Nevertheless, while a trier of fact is not bound by an expert’s conclusions, purely conjectural or uncertain loss of earning capacity awards will not be allowed. See Young v. Louisiana Medical Mut. Ins. Co., 98-522, p. 11 (La.App. 5 Cir. 12/16/98), 725 So.2d 539, 544. Factors to be considered in assessing a claim for lost earning capacity are: “the plaintiffs physical condition before the injury, the plaintiffs past work history and work consistency, the amount the plaintiff probably would have earned absent the injury complained of, and the probability that the plaintiff would have continued to earn wages over the remainder of his working life.” Rathey, 04-0199, p. 51, 894 So.2d at 471.
I37B
Turning now to this case, the record discloses that Mr. Scarberry was 47 at the time of this accident. He had worked for Oklahoma Gas virtually his entire adult life. There is no evidence in the record that he had previously suffered any injuries that forced him to take off time from work. Moreover, several medical experts testified that Mr. Scarberry was rendered permanently disabled as a result of the accident with no chance for gainful employment in the future. The evidence adduced at trial established that Mr. Scar-berry can no longer work as a result of the injuries he sustained in the underlying accident.
Dr. G. Richard Thompson, Mr. Scarber-ry’s expert economist, testified that Mr. Scarberry could have expected to work until age 67, although he was asked to assume that Mr. Scarberry would, because of medical reasons, live no more than 64 years. Dr. Thompson considered Mr. Scarberry’s age, work history, earning history and assumed, but for the accident, that Mr. Scarberry would have continued to work until age 67. Dr. Thompson testified that the average yearly salary received by Mr. Scarberry for the four years preceding the accident was $97,623.23. Based on his mathematical calculations, Dr. Thompson testified that the amount Mr. Scarberry would require to invest in short-term treasury bills in order to withdraw amounts each year equal to what he would have earned in that year was $1,872,030. Significantly, Entergy did not present a competing economist or challenge Dr. Thompson’s method of calculation.
lasWe agree with Mr. Scarberry’s assertion that the jury’s assessment of $300,000 should be reversed because it is unsupported by the evidence. While an award for loss of earning capacity is speculative in nature, it cannot be based on mere conjecture. Our review of the record reveals no evidence or testimony to support the jury’s assessment. Moreover, we note that the jury’s assessment for loss of earning capacity indicates clearly that it accepted Mr. Scarberry’s argument that, absent the accident, he had a residual capacity for work. Their quantum assessment, in light of this finding, is manifestly erroneous because it has no support in the record whatsoever.
Entergy argues that the jury undoubtedly based its assessment on the conclusion that Mr. Scarberry voluntarily took *218 retirement in 2010 at the age of 49 out of anger towards Oklahoma Gas because he felt that he was being blamed for the accident.[13] Mr. Scarberry did not deny this fact, but testified instead that he took early retirement because the work became too difficult due to his worsening medical condition.
Regardless of whose argument the jury accepted, there is no evidence in the record to suggest that Mr. Scarberry would have taken an early retirement but for the underlying accident. We have held that a person need not be employed at the time of the accident to be eligible for an award of damages for loss of earning capacity. See Rogers, 00-1424, p. 14, 813 So.2d at 506. What is being | ^compensated is “the plaintiffs lost ability to earn a certain amount, and he may recover such damages even though he may never have seen fit to take advantage of that capacity.” Finnie v. Vallee, 620 So.2d 897, 900 (La.App. 4th Cir.1993). Mr. Scar-berry’s decision to take early retirement after the accident, therefore, is of no moment because it is clear from the record that his earning capacity was decimated by the underlying accident.
Because the jury clearly concluded that Mr. Scarberry had a residual capacity to work, but based its assessment on no facts in the record, we conclude that the jury’s assessment for loss of earning capacity is manifestly erroneous. Having reviewed the testimony and evidence adduced at trial we find Dr. Thompson’s expert testimony to be reasonable and supported by evidence. Accordingly and in light of the uneontradicted evidence, we vacate the jury’s assessment of $300,000 for loss of earning capacity and increase it to $1,872,030, the lowest reasonable amount.
VI
We turn now to explain our decision with respect to the proper interpretation and application of the indemnification and hold harmless provision in the Mutual Assistance Agreement.
After the jury’s verdict which apportioned fault among the parties, the trial judge granted Mr. Scarberry’s motion to apply the indemnity provision and thereby require Entergy to compensate Mr. Sear-berry for the share attributable to his own fault. At the same time, however, the trial judge denied his motion to apply the |4nprovision to require Entergy to compensate Mr. Scarberry for the share attributable to Oklahoma Gas’s fault. Entergy appeals from this ruling insofar as it granted the relief sought by Mr. Scarber-ry, and Mr. Scarberry appeals from the ruling insofar as it denied the relief which he sought.
After our de novo review of the indemnity provision, we find that the trial judge erred in requiring Entergy to compensate Mr. Scarberry for that portion of his losses attributable to his fault, and that the trial judge correctly found that the indemnity provision did not require Entergy to compensate Mr. Scarberry Oklahoma Gas’s share of the fault.
A
The starting point for interpreting an indemnity provision is the language of the contractual provision. We cannot examine the Mutual Assistance Agreement, however, without first situating it within the greater context of the Southeastern Electrical Exchange. Accordingly, we begin by discussing the Southeastern Electri *219 cal Exchange and examining those portions of the Mutual Assistance Agreement that bear directly upon the indemnity issue.
The Southeastern Electrical Exchange is a non-profit trade association comprised of numerous utility companies, including the Entergy defendants, that provide electricity to approximately twenty eastern, southeastern, and Midwestern American states. One of the Exchange’s primary purposes is to provide coordinated storm restoration work to affected member utility companies. Towards this end, Exchange members have entered into a Mutual Assistance |41 Agreement. In the Mutual Assistance Agreement’s “Statement of Understanding and Endorsement,” Exchange member companies recognize that “they will have occasion to either provide or receive assistance in the form of personnel and equipment to aid in restoring electric service when it has been disrupted and cannot be restored in a safe and timely manner by the affected company or companies without assistance.” Accordingly, the Exchange developed and maintains “operating procedures and guidelines to insure the most effective and efficient response by the entire membership when emergency assistance is requested by one or more member companies.”
Exchange member companies, as signatories to the Mutual Assistance Agreement, further acknowledge that whether “providing or receiving assistance, personnel safety will be the preeminent objective and responsibility of all participants.” Similarly, Exchange member companies averred that whether providing or receiving assistance, they will “work together to minimize risk to all parties” and that “responding companies will provide assistance (personnel and equipment) on a not-for-profit basis, and requesting companies will reimburse responding companies for all expenses incurred in providing the assistance” in accordance with the Mutual Assistance Agreement’s indemnification provision. Importantly for our purposes, this agreement also indicates that the terms ^“Responding Company” and “Requesting Company” refer to both the company and its employees.[14]
Although the Mutual Assistance Agreement is comprised of largely technical and logistical provisions, which need not be examined for a thorough resolution of this case, the issues before us implicate several specific provisions. For example, the Mutual Assistance Agreement places a high premium on personnel safety. Specifically, subsection 2.1 provides that “personnel safety will be the preeminent objective and responsibility of all participants” regardless of whether they are providing or receiving assistance. Responding companies, nevertheless, will follow their own safety rules (except with respect to accident reporting and power grid switching procedures). Likewise, subsection 2.4 provides that responding companies are responsible for following their own personal protective grounding practices. Requesting companies, however, are obligated by subsection 2.7 to inform responding companies as to their own switching/tagging rules and to provide responding companies with “system blocking” tags.[15] Further, requesting companies are obliged by sub *220 section 15.3 to provide guides to assist responding company work crews.
Notably, the Mutual Assistance Agreement also provides significant provisions covering reimbursement of expenses and indemnification. Subsection 17.1 recognizes that “the provision of emergency mutual assistance is a not-for-fprofify endeavor” for the responding companies. Requesting companies will, therefore, “reimburse all costs and expenses incurred by the Responding Company in the provision of the emergency assistance for the entire emergency assistance period.” Requesting companies, moreover, are obligated to pay all preliminary and final responding company invoices, provided they are supported by proper documentation, within sixty calendar days of receipt.
With respect to indemnification, which is the contractual provision which here controls, subsection 17.6 provides that a requesting company shall indemnify and hold a responding company (and/or its employee) harmless from and against “any and all liability for loss, damage, cost or expense which Responding Company [and/or its employee] may incur by reason of bodily injury, including death, to any person or persons or by reason of damage to or destruction of any property, including the loss of use thereof, which result from furnishing emergency assistance and whether or not due in whole or in part to any act, omission, or negligence of Responding Company [and/or its employee].”[16] Subsection 17.6 also provides that a requesting company is obligated to reimburse a responding company for payments made “under a worker’s compensation or disability benefits law or any similar law for bodily injury or death resulting from furnishing emergency assistance.” Finally, subsection 17.1 indicates that, in the event a claim is made or a lawsuit filed against a responding company alleging liability for which |44a requesting company would be hable under subsection 17.6, a requesting company, “at its sole cost and expense, shall settle, compromise or defend the same in such manner as it in its sole discretion deems necessary or prudent.”
B
We now discuss the law applicable to indemnity agreements. We will next examine the specific language of the provision in question. Finally, we will analyze the parties’ respective claims regarding the re-allocation of Mr. Scarberry’s and Oklahoma Gas’s respective percentages of fault.
1
Here, we discuss briefly the law regarding indemnity or hold harmless agreements. Indemnity in its most basic sense means reimbursement and may lie when one party discharges a liability which another rightfully should have assumed. See Nassif v. Sunrise Homes, Inc., 98-3193, p. 2 (La.6/29/99), 739 So.2d 183, 185. It is based on the principle that everyone is responsible for his own wrongdoing, and if another person has been compelled to pay a judgment which ought to have been paid by the wrongdoer, then the loss should be shifted to the party whose negligence or tortious act caused the loss. Id. The obligation to indemnify may be express, as in a contractual provision, or may be implied in law, even in the absence of an indemnity agreement. Id.
*221 As noted by Professor Litvinoff: “An indemnity, or hold harmless, agreement is a contract whereby a party, called the indemnitor, agrees to protect another, called the indemnittee, against damages incurred by the latter as a result of |4Shis breach of a duty owed to a third party.” 6 La. Civ. L. Treatise, Law of Obligations § 11.27 (2nd ed.). Thus, the parties to a contract containing an indemnification provision may adjust or allocate the risk of loss or damage that may arise in the performance of their respective obligations. This issue of whether an indemnitee may be indemnified against its own negligent acts was addressed over forty years ago in Arnold v. Stupp Corp., 205 So.2d 797 (La.App. 1st Cir.1967). In that case, the court of appeal surveyed the case law and noted:
The general rule is stated thus: “A contract of indemnity will not be construed to indemnify the indemnitee against losses resulting to him through his own negligent acts, where such intention is not expressed in unequivocal terms. 27 Am.Jr., Indemnity, § 15, page 464; 42 C.J.S. Indemnity § 12, page 580.” The established principle supporting the rule is that general words alone, i.e., “any and all liability”, do not necessarily import an intent to impose an obligation so extraordinary and harsh as to render an indemnitor liable to an indemnitee for damages occasioned by the sole negligence of the latter.
Arnold, 205 So.2d at 799.
Subsequently, in Perkins v. Rubicon, Inc., 563 So.2d 258, 259 (La.1990), the Louisiana Supreme Court held that an indemnity contract will not be construed to indemnify an indemnitee against losses resulting to him through his own negligent acts unless such an intention is expressed in unequivocal terms. Therefore, in order to find that an indemnity contract indemnifies the indemnitee against the consequences of his own negligence, it must be shown that the contract expresses such language in clear, unequivocal terms. See Roundtree v. New Orleans Aviation Board, 02-1757, p. 8 (La.App. 4 Cir. 4/9/03), 844 So.2d 1091,1096.
[[Image here]]
Prior to trial, the plaintiff brought a motion for partial summary judgment seeking to limit the scope of the jury’s allocation of fault to the Entergy companies alone. The trial judge refused to limit the jury in this matter, but concluded that the foregoing indemnification language mandated the allocation to Entergy of any percentage of liability that the jury might apportion to Mr. Scarberry. Conversely, the trial judge also ruled that any portion of liability that might be attributable to Oklahoma Gas could not then be attributed to Entergy.
On appeal, Mr. Scarberry argues that the pertinent language of the Mutual Assistance Agreement indicates an intent by the parties to waive Louisiana’s comparative fault scheme. Therefore, Mr. Scar-berry contends that the trial judge properly assigned legal responsibility for his own degree of fault to Entergy, but erred when it refused to do the same for Oklahoma Gas’s percentage of fault. Conversely, Entergy asserts that the trial judge erred when he obligated Entergy to compensate Mr. Scarberry for his own self-inflicted injuries, but ruled correctly when it refused to apportion Oklahoma Gas’s percentage of fault to Entergy.
We base our decision largely on the clear wording of the Mutual Assistance Agreement. Having reviewed the indemnity provision and the applicable jurisprudence, we conclude that the trial judge erred as a matter of law when he cast Entergy in judgment for that percentage of fault attributed by the jury to Mr. Scar- *222 berry for his own injuries. Conversely, we affirm the trial judge’s refusal to apportion Oklahoma Gas’s percentage of fault to En-tergy.
|47In interpreting contracts such as indemnity clauses, we are guided by the general rules contained in Articles 2045 through 2057 of the Louisiana Civil Code. The interpretation of a contract is the determination of the common intent of the parties. See La. Civil Code arts.2045, 2047. See, e.g., Berry v. Orleans Parish School Bd., 01-3283, p. 3 (La.6/21/02), 830 So.2d 283, 285. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the intent of the parties. See La. Civil Code art. 2046.
With respect to the Mutual Assistance Agreement, we find that the indemnification provision is triggered by a Responding Company’s incursion of liability. Specifically, the indemnification provision protects a Responding Company from “any and all liability for loss, damage, cost or expense which Responding Company may incur ... which result from furnishing emergency assistance and whether or not due in whole or in part to any act, omission, or negligence of Responding Company.” Thus, a finding of liability is a precursor to indemnification under the Mutual Assistance Agreement. Mr. Scarberry urges us to read the indemnification provision in a manner that separates the inclusion of the phrase “damages” from the phrase “liability for loss.” A clear reading of the section prohibits us from giving Section 17.6 such a reading.[17]
|4SRather, an examination of relevant jurisprudence supports our conclusion that the terms “liability” and “incur,” as used in the indemnity agreement at suit, imply first a legal imposition of responsibility. For example, it is axiomatic that delictual liability consists of fault, causation, and damage. To establish liability, a plaintiff must prove that the defendant’s fault caused some legally compensable damage. See Hall v. Brookshire Brothers, Ltd., 02-2404, p. 11 (La.6/27/03), 848 So.2d 559, 567. “Liability” is defined in Black’s Law Dictionary, 915 (6th ed.1990), as “[bjound or obliged in law or equity; responsible; chargeable; answerable; com-pellable to make satisfaction, compensation, or restitution.”[18] Similarly, “legally liable” is defined as “[ljiable under law as interpreted by courts.” Sumrall v. Bickham, 03-1252, p. 9 (La.App. 1 Cir. 9/8/04), 887 So.2d 73, 79. Further, the word “incur” implicates the concept of liability. We have defined “incur” accordingly: “ ‘To have liabilities (or a liability) thrust upon one by act or operation of law5; a thing for which there exists no obligation to pay, either express or implied, cannot in law constitute an ‘incurred expense’; a debt or expense has been incurred only when liability attaches.” Irby v. GEICO, 175 So.2d 9, 10 (La.App. 4 Cir.1965).
*223 I49C
Therefore, a Requesting Company’s indemnification obligation under section 17.6 of the Mutual Assistance Agreement is triggered only upon the imposition of legal responsibility for loss, damage, cost, or expense. The trial judge, thus, erred when he assigned Mr. Scarber-ry’s portion of fault to Entergy because Mr. Searberry was never found liable to himself for his own injuries. Based upon that same reasoning, however, we affirm the trial judge’s ruling with respect to Oklahoma Gas because it, as Mr. Scarber-ry’s employer, was statutorily immune under both Louisiana and Oklahoma law from liability under these circumstances. See La. R.S. 28:1032, and 85 Okl. St. Ann. § 12. We, accordingly, reverse that portion of the final judgment that apportioned Mr. Scarberry’s percentage of fault to En-tergy, and affirm that portion of the final judgment that did not apportion Oklahoma Gas’s percentage of fault to Entergy.
CONCLUSION
By way of summary, we first conclude that, because there was no erroneous jury instruction which contributed to the verdict, there is no legal basis for us to review this matter de novo as requested by En-tergy. We next conclude, under the appropriate standards of review, that the jury did not abuse its discretion in the assessment of general damages nor that its apportionment of fault was clearly wrong. We do find, however, the jury’s assessment of Mr. Scarberry’s reduced earning capacity to be clearly wrong and accordingly amend the judgment to reflect the increase in that amount. Finally, we conclude from our de novo review 1 fi0of the indemnity agreement that the judgment must be modified to delete the trial judge’s redistribution of the loss for Mr. Scarber-ry’s comparative fault to Entergy.
DECREE
The trial court judgment is amended and affirmed as amended. Accordingly, there is judgment herein in favor of Buddy Searberry in the amount of TWO MILLION EIGHT HUNDRED EIGHTY SIX THOUSAND SIX HUNDRED AND NINE ($2,886,609) DOLLARS against defendant Entergy Gulf States Louisiana, L.L.C., with legal interest thereon from the date of judicial demand until paid, and ONE MILLION NINE HUNDRED TWENTY FOUR THOUSAND FOUR HUNDRED AND SIX ($1,924,406) DOLLARS against defendant Entergy Services, Inc., with legal interest thereon from the date of judicial demand until paid, representing the percentage of fault attributed by the jury to each defendant, and for all costs of these proceedings which are to be taxed to the defendants in their proportional share.
AMENDED AND AFFIRMED AS AMENDED.

. Because there is no practical difference in this case, the Entergy companies will be referred to throughout simply as Entergy. See, however, n. 6, post

. Although not a party-defendant because of statutory immunity, Oklahoma Gas intervened in the suit to recover the weekly indemnity and medical benefits paid to Mr. Searberry under Oklahoma's worker's compensation regime.

. We discuss the Southeastern Electrical Exchange more fully in Part VI(A), post.

. La. Civil Code art. 2317 provides in pertinent part that we “are responsible, not only for the damage occasioned by our own act, but for that which is caused by ... the things which we have in our custody.” La. Civil Code art. 2322 provides in part that the “owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice or defect in its original *204 construction. However, he is answerable for damages only upon a showing that he knew or, in the exercise of reasonable care, should have known of the vice or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care.”

. We note, however, that the jury instructions did touch on the dangerous nature of electrical lines within the context of comparative fault as opposed to duty: "In comparing the conduct of the parties in this case, note that the purpose of an electric power line is to carry an electrical current. The mere existence of such line constitutes adequate notice of the fact that it does carry electricity, or at least that it is highly probable that the line is energized and that it will be dangerous to come into contact with it.” •

. The jury, specifically, attributed thirty percent of the fault to defendant Entergy Gulf States Louisiana, L.L.C., and twenty percent of the fault to Entergy Services, Inc. The Entergy defendants, however, do not assail the individual assessments, preferring instead to seek reversal or modification of the combined percentage of fault attributed by the jury to both companies.

. Mr. Moore's status under Entergy’s own restoration rules as either a Circuit Boss or a mere guide was hotly contested at trial because resolution of this issue would determine how much responsibility Mr. Moore, and thus Entergy, would have for the safety of the OG & E work crew. We pretermit discussing this matter until part 111(B)(3), post.

. We discuss Mr. Scarberry’s injuries and post-accident medical history in Part IV(B), post.

. Trunk feeders are high voltage lines that carry electricity out from electrical substations.

. We note that Entergy assigns as error the trial judge’s exclusion of certain portions of the deposition testimony of Richard Berg, Oklahoma Gas’s lead representative in Louisiana at the time of the accident, concerning his understanding of Entergy's Crew Guide designation, and the duties associated with such a designation. Entergy proffered these portions of Mr. Berg’s deposition testimony and asserted that the trial judge’s failure to admit these portions was an abuse of discretion mandating our de novo review of the record. Determining the appropriateness of evidence is the province of the trial court, and such a determination will not be overturned absent an abuse of discretion. See Yokum v. Pat O’Brien's Bar, Inc., 12-0217, p. 11 (La.App. 4 Cir. 8/15/12), 99 So.3d 74, 82. We have reviewed Mr. Berg’s proffered testimony. We find that the opinions of Mr. Berg, an Oklahoma Gas employee, as to internal Enter-gy job classifications, restoration procedures, and documents are speculative and inadmissible lay witness opinion testimony. See La. C.E. art. 701. Accordingly, we do not find that the trial judge’s rulings constituted an abuse of discretion.

. Entergy does not challenge the jury’s special damage award of $3,000,000.00 in past and future medical expenses to Mr. Scarber-ry.

. Citing Corliss v. Elevating Boats, Inc., 599 So.2d 434, 437 (La.App. 4 Cir.1992).

. Entergy’s argument on this point is not based on Mr. Scarberry’s testimony at trial, but instead on his psychologist's impressions of statements made by Mr. Scarberry over the course of his treatment.

. Mr. Scarberry, therefore, is a third party beneficiary under the terms of the Mutual Assistance Agreement. See Smith v. State Farm Ins. Companies, 03-1580 (La.App. 4 Cir. 3/3/04), 869 So.2d 909.

. Like "hold” and "danger” tags, a "blocking” tag is a small safety label that lineman affix to open fuses and switches in order to alert other lineman that a given line is being serviced.

. This provision does not apply in the event that "that such death or injury to person, or damage to property, is caused by the willful or wanton misconduct and/or gross negligence of the Responding Company.” This exception, however, is not implicated by the facts of this case.

. While it is clear that all members who signed the Mutual Assistance Agreement consented unequivocally to Section 17.6 wherein an indemnitee is indemnified against the consequences of his own negligence, it is anything but clear that the signing members, some of which are domiciled in states that do not have pure comparative fault tort law, were contracting away the benefits of comparative fault systems. Indeed, we could find no reported Louisiana case wherein such language has been interpreted in a manner consistent with that given it by the trial judge in this case.

. In Hall, the Supreme Court discussed the meaning of “liability” within the context of comparative fault under La. Civil Code art. 2323 and the Medical Malpractice Act (La. R.S. 40:1299.41, et seq.).