PAUL A. BONIN, Judge.
hLeah and Michael Tubbs agreed to purchase the home of Mignon and Thomas Schafer and gave the Schafers a promissory note as a good faith deposit that they would perform under the written agreement. The Schafers sued the Tubbs to collect the note because the Tubbs failed to appear for the closing, or act of sale, scheduled by the Schafers.[1]
The Tubbs contended that their obligation to pay the note was extinguished because the purchase-sell agreement became null and void when they were unable to obtain specified financing for the purchase, all a's provided by the agreement itself.’ Arguing that the Tubbs misrepresented the status of their financing arrangements, the Schafers countered that the financing condition was fulfilled by operation of law due to the fault of the Tubbs. The Tubbs, in their reconventional | .¿demand, however, sought damages, attorneys’'fees, and costs for the Schafers’ alleged breach of the agreement by refusing to return the promissory note.
The trial judge ruled that the Tubbs’ obligation to purchase the home was extinguished by the failure of the financing condition, which rendered the agreement null and void, and that the Schafers must return,the promissory note to the Tubbs. On the reconventional demand, however, the trial judge, finding a breach of the Schafers’ obligation under the same purchase-sell agreement, awarded the Tubbs damages and attorneys’ fees. The Schaf-ers appeal the trial judge’s rulings ordering the return of the promissory note (implicitly dismissing their principal demand) and at the same time awarding the Tubbs damages and attorneys’ fees under the agreement which the trial judge concluded was null and void. The Tubbs answer the appeal and seek an increase in damages in an amount equal to the promissory note.
*636 We have conducted a de novo review of the purchase-sell agreement and conclude that it is clear and unambiguous, especially with respect to the suspensive condition respecting the Tubbs’ financing of their purchase and the legal effect of the non-fulfillment, or failure, of the suspensive condition. We have reviewed under the well-known manifest error-clearly wrong standard the trial judge’s factual findings that the Tubbs did not obtain financing within the time stipulated in the agreement and that the condition was. pot fulfilled by their fault in misrepresenting that the condition had been satisfied. The trial judge’s. factual findings were not clearly wrong and were reasonable. Moreover, we find that the |,9trial judge was legally correct in determining that the.purchase-sell agreement was null and void due to the failure of the suspensive condition. And, on that same account, we find that the trial judge was legally incorrect in awarding the Tubbs damages or attorneys’ fees as might otherwise have been recoverable under the agreement as written and, accordingly, we amend the judgment in the Tubbs’ favor to delete the award of any damages and attorneys’ fees.
We explain our decision in considerably greater detail in the following Parts.
I
We begin, in this Part, our explanation with an extended description of the course of the proceedings and of the arguments of the parties.
Upon the acceptance of the purchase-sell agreement by the Tubbs and Schafers, the Tubbs delivered to the Schafers a promissory note, payable to the Schafers, in the'amount of $53,050. The note was given in lieu of cash and constituted the Tubbs’ good faith deposit that they would perform their obligation under the agreement. As the expiration of the time period covered by the agreement, as extended by the parties, approached for the act of sale to close, the Schafers set the closing before a notary. The Tubbs did not appear for the closing. ■ • '
The Schafers then filed this suit seeking to enforce collection of thé promissory note as stipulated damages for'-the alleged breach by the Tubbs of their obligation to purchase the home. The Tubbs, as they had before the scheduled closing; stated that the purchase-sell agreement was null and' void because they had been unable to secure financing for the purchase. The agreement, they contended, [4was conditioned upon their ability to obtain financing as specified in the agreement. Their financing commitment was, however, conditioned upon the sale of their home, and their home was not sold before the commitment expired. The failure of that condition not only rendered the agreement null and void but necessarily rendered the secondary obligation of forfeiture of their good faith deposit unenforceable.
The Tubbs also interjected that the Schafers were responsible for their inability to timely secure financing. The Tubbs pointed out that the Schafers.had introduced them to some friends who were looking to move into.the Tubbs’ neighborhood. Believing that those friends, the Warners, were financially able to purchase their home as agreed in a purchase-sell agreement, different from the one which we have under consideration, the Tubbs did not advertise their home for sale. The condition of their financing by the lender was that the Tubbs sell their home on Broadway and use a significant portion of the net proceeds toward the purchase price of the Schafers’ State Street home. In effect, the Tubbs were reconvening and claiming that the Schafers breached their obligation to sell the house and owed the Tubbs an amount equal to their good faith *637 deposit or $53,050. The Tubbs also claimed the Schafers breached the agreement by not returning the promissory note.
Reacting to this interjection, the Schaf-ers contended that the Tubbs concealed from them that the lender had conditioned its financing of the purchase of the State Street home on the sale of the Broadway home. The Schafers | ¡¡countered that they would never have agreed to such a condition. Moreover, the Schafers argued that the Tubbs actively misrepresented the status of their financing and thus, due to the Tubbs’ fault, the suspensive condition of the purchase-sell agreement was deemed fulfilled such that the Tubbs forfeited the good faith deposit by not appearing for the-closing and purchasing the home.
Following a bench trial, the trial judge decided that the purchase-sell agreement was null and void and that the promissory note was not enforceable. Despite this finding, however, the trial judge'went on to find that the Schafers' breached the agreement arid condemned them to pay the Tubbs damages in the amount of $5,000 as well as the Tubbs’ attorneys’ fees.,
Then, following the ruling, the parties tacked in a different direction. , Still contending that the agreement was not null and void, the Schafers alternatively argue that the only basis for an award of damages and attorneys’ fees would be the null agreement such that there is no legal basis for the awards. The Tubbs, in their change of course, answered[2] the Schafers’ appeal but argue now that the agreement provides for stipulated damages of $53,050 for a breach and not the actual damages of $5,000.
II
A
The gateway to our decision must necessarily be an exposition of the particular purchase-sell agreement. The Tubbs-Schafers’ agreement is a species of lficontract. See La. Civil Code art. 2623; 1100 South Jefferson Davis Parkway, LLC v. Williams, 14-1326, p. 5 (La.App. 4 Cir. 5/20/15), 165 So.3d 1211, 1216. And, of course, it is axiomatic that a contract has, the effect of law between the parties, and the courts are bound to interpret them according to the common intent of the parties. See La. Civil Code Arts. 1983 and 2045.
If the words of a contract are clear, unambiguous, and lead to no absurd consequences, we may not look beyond the contract language to determine the true intent of the parties. See La. Civil Code art. 2046. Each provision in a contract must be interpreted in light .of the othe^, provisions so that .each is given the meaning suggested by the contract as a whole. See La. Civil Code. art. 2050. “When a contract is not ambiguous or does not lead to absurd consequences, it will be enforced as written and its interpretation is a question of law for a court to decide.” Lalla v. Calamar, N.V., 08-0952, p. 8 (La.App. 4 Cir. 2/11/09), 5 So.3d 927, 932, quoting American Deposit Ins. Co. v. Myles, 00-2457, p. 5 (La.4/25/01), 783 So.2d 1282, 1286. Meaning and intent of parties to a written instrument is ordinarily determined from the instrument’s four corners and extrinsic evidence is inadmissible either to explain or to contradict the instrument’s terms; See Lalla, 08-0952, p. 8, 5 So.3d at 932. And, notably, the interpretation of a contract’s provisions is typically a matter of law. See Hall v. Malone, 12- *638 0264, pp. 4-5 (La.App. 4 Cir. 11/7/12), 104 So.3d 593, 596.
ItB
The general object of this agreement is, obviously, the purchase of the home by the Tubbs and the sale of the home by the Schafers. After several rounds of offers and counter offers, the Tubbs on February 23, 1999, presented the Schafers with the offer that was to form the basis of the purchase agreement.. The Schafers, by way of letter dated February.25, 1999, accepted the Tubbs’ offer. As confected by the parties, the purchase agreement obligated the Tubbs to purchase, and the Schafers to sell, the State Street home at a price of $530,500. The purchase agreement at issue, therefore, is' “a bilateral promise of sale or contract to sell.” La. Civil Code art. 2623. It is, in other words, an “agreement whereby one party promises to sell and the other promises to buy a thing at a later time, or Upon the happening of a condition, or upon performance of some obligation by either party.” Id. (emphasis added). “Such an agreement gives either party the right to demand specific performance.” Id. The Schafers’ primary obligation under the purchase agreement was to deliver and warrant merchantable title. See La. Civil Code art. 2475.[3] And the Tubbs’ primary obligation was to pay the purchase price and take delivery of the property. See La. Civil Code art. 2549.[4]
The first specific feature of this agreement, however, is that the parties’ respective obligations to purchase or sell. the home are clearly conditioned .upon the Tubbs’ ability to secure financing:. “This sale is conditioned upon, the ability of the | spurchaser to borrow upon this property as security the sum of $424,400.00 by a mortgage loan or loans-at a rate of interest not to exceed 7% per annum, interest and principal payable in equal monthly installments, over a period of 30 years.” The agreement afforded the Tubbs- forty-five days from the acceptance of the agreement to secure financing and, especially important for our purposes, expressly provided for the consequence of the inability of the Tubbs -to obtain financing: “Should the loan stipulated above be unobtainable by the purchaser, seller or .agent within 45 days from date of acceptance hereof, this contract shall then become null and void, and the agent is hereby authorized to return the purchaser’s deposit in full.”[5] (emphasis added). '
The second specific feature of this agreement is a provision which required the purchaser to deposit a demand promissory note in the amount of 10% of the purchase price. With reference to this dep'osit, the agreement further provided that upon the failure of the Tubbs' to comply “with this agreement within the time specified, the seller shall have the right to declare the deposit, ipso facto, forfeited, ...; or the seller may demand specific performance.” Conversely, as we have already indicated, the agreement also provided a remedy to the Tubbs in the event of the Schafers’ failure to comply: “the purchaser shall have the. right either to *639 demand the return of his deposit in full plus an equal amount to be paid as a penalty by the seller; or the purchaser may demand specific performance, at his | noption.” And it is from these provisions of the agreement that the parties claim their entitlement to the amount of $58,050 from the other. These provisions are penal clauses, secondary obligations “for the purpose of enforcing the principal one.” La. Civil Code art. 2005.
A third specific feature of this agreement is the provision which states that “[ejither party hereto who fails to comply with the terms of this offer, if accepted, is obligated to pay all fees and costs incurred in enforcing collection and damages.” It is this provision of the agreement that is the basis for the trial judge’s award of $5,000 damages plus attorneys’ fees to the Tubbs.
C
Our independent review of the agreement satisfies us that in its salient provisions it is clear and unambiguous. The Tubbs’ obligation to purchase the Schafers’ home, as well as the Schafers’ obligation to sell their home, is clearly conditioned upon an uncertain event, which is the Tubbs’ ability to secure financing. Thus, neither party’s obligation arising under the agreement can be enforced until the uncertain event occurs. See La. Civil Code art. 1767. And, importantly, “[i]f the condition that an event shall occur within a fixed time and that time elapses without the occurrence of the event, the condition is considered to have failed.” La. Civil Code art. 1773.
The determination of whether the sus-pensive condition was fulfilled or failed is in this case a question of fact for the trier of fact, and we turn to the Schafers’ argument and a review of the trial judge’s factual findings.
JbnI
In this Part we consider the Schafers’ main argument that the trial judge erred in her implicit[6] rejection of their demand for enforcement of the contract’s penalty provision because she concluded that the suspensive condition failed. The Schafers, relying upon La. Civil Code art. 1772 (“[a] condition is regarded as fulfilled when it is not fulfilled because of the fault of a party with an interest contrary to the fulfillment”) contend the trial judge should have found the Tubbs at fault for misrepresentation, and that this misrepresentation should be imputed to the Tubbs as the fulfillment of the purchase agreement’s financing condition.[7]
The Schafers anchor their argument on a proposed extension agreement that the Tubbs sent to them in an attempt to secure a postponement of the April 30, 1999 closing date. They point specifically to the following language: “Purchaser further *640 warrants that loan approval has been obtained.”[8] The Schafers maintain that this statement was false. This assurance, they argue, lulled them into believing that the Tubbs had secured financing. And they claim that they would not have consented, absent this belief, to the extension. Because the Tubbs falsely | ^represented the status of their financing, the Schafers argue, the Tubbs should be precluded from asserting the nullity of the purchase agreement. The Tubbs, on the other hand, assert that the Schafers knew from the beginning that they would first' need to sell their home in order to purchase the Schaf-ers. Moreover, Mr. Tubbs testified on cross-examination that he was certain that he told Mr. • Schafer that Countrywide’s offer of financing was conditioned upon the sale of the Broadway home. The Tubbs, accordingly, argue that trial judge properly rejected the Schafers’ allegations because the facts show that they did not mislead the Schafers or misrepresent the state of their financing.
A
We must,- therefore, examine the parties’ conduct leading up to the act of sale.
Mrs. Tubbs testified that on the afternoon of February 21,1999, she, Mr. Tubbs, their two children, and her parents, the Smiths, were driving in uptown New Orleans when her parents spotted a for-sale-by-owner sign in the yard of the Schafers’ State Street property. Mr. Tubbs and the Smiths suggested that she call the- phone number on the sign and take a tour of the house., Mrs. Tubbs called, spoke with Mrs. Schafer, and arranged for a showing shortly thereafter. Later, the Tubbs, along with their children and the Smiths, spent approximately thirty to forty-five minutes, walking through the Schafers’ home.
After walking through the house, Mr. Tubbs, his fáther-in-law, and the children went outside to look at the back yard while Mrs. Tubbs remained inside |1?and spoke with Mrs. Schafer. When he returned, he heard Mrs. Schafer urging Mrs. Tubbs to make an offer on the house. Mr. and Mrs. Tubbs both testified on cross-examination to telling Mrs. Schafer that before they could buy her home, they needed to first sell their current home, which was situated in uptown New Orleans on Broadway. The Tubbs then asked Mrs. Schafer about the process of selling their Broadway home, which was not listed at the .time, without the assistance of a realtor. Mrs. Schafer, according to Mr.' Tubbs, stated that the process was not a complicated one. Mr. Tubbs also testified that Mrs. Schafer informed them that her husband had experience at selling homes, could provide' him with the necessary forms, and also guide him through the process. Mrs. Schafer, according to Mr. Tubbs, then asked about the Tubbs’‘ Broadway home. Mr. Tubbs testified that after describing the home to her, Mrs. Schafer informed them that some friends of hers were looking to move into uptown New Orleans and that they might.be interested in looking at the Tubbs’ home.
The Tubbs then left. Although they had only $8,000 in cash on hand at the time, the Tubbs decided to make an offer. Mrs. Tubbs, testifying on cross-examination, explained their thinking: “And, you know, when Michael and I discussed it, once we left the house, I said, they’ve got someone interested, you know, why don’t we put in an offer. You know, maybe they will come *641 our way. You know, we will — she said just put in an offer, give Tom an offer, write me an offer, so we did. We just wrote an offer.” In their hand-written offer, the Tubbs offered the Schafers $525,000 for their home, but predicated it on several 11sconditions. Significantly, it provides that “[t]his offer is subject to ... the buyers being able to obtain financing within forty-five (45) days.” Later, that day, Mr. Tubbs drove by the Schafers’ home and delivered the offer.
The Tubbs both testified to receiving phone calls from Mr. Schafer the following morning.' Although Mr. Schafer denied ever speaking with her, Mrs.' Tubbs testified on cross-examination that he called her early the following morning to let her know that he had received the offer. According to Mrs. Tubbs, Mr. Schafer also stated that he had a friend who had just driven by the Tubbs’ home, liked what he saw, and wanted to visit later that day, Mrs. Tubbs, however, asked Mr. Schafer to call her back after she had finished cleaning the house. Mr. Schafer never called back. Rather, Mrs. Tubbs testified that David Warner, the friend about whom the Schafers had spoken, called her after she spoke with Mr. Schafer, asked about the house, and arranged a visit for later that day. According to Mrs. Tubbs, Mr. Warner toured her home and then asked if he could come back later with his wife so that she could view the property. Mrs. Tubbs assented and, later that day, Mr. Warner returned to the Tubbs’ home with Mrs. Warner. The Warners returned later that week, this time with their daughter, to again view the house.
Mr. Schafer, according to Mr. Tubbs, also called him on the telephone the morning of February 22, 1999, to say that he had received the offer, was reviewing it, and would probably make a counter offer. Mr. Schafer, according to Mr. Tubbs, also brought up the sell-by-ownér process, told him that he had the necessary forms, which he offered to prepare for the Tubbs and “walk [them] through the | Mprocess.” Later that afternoon, according to Mr. Tubbs, Mr. Schafer hand-delivered his counter offer to the Tubbs’ home. Mr. Schafer, however, denied eyer visiting the Tubbs’ Broadway home, claiming instead that he faxed the document to Mr. Tubbs.[9]
The Schafers, specifically, countered with an offer to sell at $549,500. In his typed cover letter, which the Schafers introduced into evidence, Mr. Schafer writes: “As a counter offer to your offer, dated February 21, 1999, I submit the attached Agreement to Purchase or Sell, which I believe incorporates the terms and conditions of your offer.” He noted that he left empty the form’s section on purchaser financing, because he did not know the Tubbs’ intentions on the topic, and invited the Tubbs to fill out this section. He also observed that because neither party is represented by an agent, he would “be glad to discuss this offer with” Mr. Tubbs in order “to allay whatever concerns [he] may have and consider any further conditions [he] may like to include in .the agreement.”
On the following day, February 23,1999, the Tubbs responded in writing to the Schafers’ counteroffer with their own counteroffer. Both parties introduced into evidence the Tubbs’ counteroffer and accompanying cover letter. In the cover letter, Mr. Tubbs writes: “We have modified the Agreement to Purchase/Sell to reflect the changes to your counter offer dated 2/22/99. In discussing this with our mortgage company we believe we have *642 done the best we can do.” The Schafers, |1Bby way of letter dated February 25, 1999, accepted the Tubbs’ February 23, 1999 counteroffer, and the date for the act of sale was set for April 30, 1999.
At the same time as the Tubbs negotiated with the Schafers on the terms of sale for the Schafers’ home, the Tubbs also discussed with the Warners the terms of sale for their Broadway home. The War-ners, according to Mrs. Tubbs, loved the house and asked on their first visit about their asking price. Mrs. Tubbs noted that Mr. Warner also told her specifically that he intended to pay cash for the house. The Tubbs, however, had not yet put a price on their house. According to Mrs. Tubbs, Mr. Warner stated that his primary residence was on Martha’s Vineyard, and he intended the Broadway house to be his second home. Shortly thereafter, the Tubbs informed the Warners that they wanted $379,000 for the house. According to Mr. Warner, however, there were no negotiations with the Tubbs:
A. Well, again, we negotiated the price and the price was did-da-dit-da-dit-da-dit and not a cent less.
Q. You say did-da-dit-da-dit-da-dit and not a cent less, is that what the Tubbs told you?
A. That this was the price of the house.... And I got the impression they were going — that was the price and that was it. There was no negotiating. So if I'wanted to give them an offer, forget it. That was the number.[10]
The Warners verbally accepted the Tubbs’ offer to sell for $379,000 during the same week that the Schafers and Tubbs negotiated the terms of their respective | ¶ (¡purchase agreement. Mr. Warner asked Mr. Tubbs to prepare the purchase agreement and suggested that he ask Mr. Schafer for the requisite form. Mr. Schafer provided the form to Mr. Tubbs on February 23, 1999. Mr. Tubbs then filled out the form and mailed it to the Warners on March 3, 2015. The Tubbs and Warners both signed the agreement on March 7, 2015. The Warners’ purchase agreement, notably, provides: “This sale is conditioned upon purchasers selling 440 Fairway Dr., N.O.L.A. 70124 [the Warners’ home] for 725,000.00 cash & using 379,600.00 to buy 501 Broadway.” Like the Tubbs’ agreement with the Schafers, their agreement with the Warners provided that the act of sale was to transpire on April 30, 1999, before the Schafers’ closing attorney.
As Mr. Tubbs noted on direct examination: “It was sort of too good to be true. We made an offer on a house, next day, we got a buyer on our house, agreed to a cash sale, agreed to our price, the number we needed to obtain the loan and pay the down payment. So it was — it was just almost too good to be true.” Indeed it was. The two sales did not close on April 30. Rather, Mr. Tubbs testified that on March 25, 1999, he received a facsimile from Mr. Warner in which he wrote: “With regards to closing on April 30th, my purchaser does not want to close until June 1st and he will not consider doing it sooner. Please give me a call if you would like to discuss.”[11] Mr. Tubbs spoke with Mr. Warner later that day, who confirmed the substance of the facsimile. Mr. Tubbs then contacted Mr. Schafer in order to secure an extension to the act of sale for the State Street property. Mr. 117Schafer *643 agreed to the extension, but only if Mr. Tubbs agreed to pay him an additional $3,720.64.[12] Mr. Tubbs agreed- to Mr. Schafer’s proposal and the parties agreed to extend the closing date to June 1, 1999.
Mr. Tubbs then spoke with Gregory Faia, Mr. Schafer’s closing attorney, in order to secure a suitable form to formalize the extension/amendment to the purchase agreement. Upon speaking with Mr. Faia, Mr. Tubbs learned for the first time that Mr. Warner was in bankruptcy. Testifying that he was “pretty shocked and concerned,” Mr. Tubbs called Mr. Schafer who tried to assuage his fears: “He said I really shouldn’t be concerned. He was aware of the bankruptcy. He had represented him in bankruptcy, that we were in actually better shape because there was, you know, a court — bankruptcy court approval that he was going to sell his home and buy ours, and we were in, you know, better shape than we were than most other transactions.”[13]
What Mr. Schafer was referring to, and what Mr. Tubbs would later discover, was that on March 11, 1999 — four days after the Tubbs and the Warners signed their purchase agreement — Mr. Warner filed a motion in banlmiptcy court seeking authorization to sell his current home and purchase the Tubbs’ home.[14] In hsthis motion, Mr. Warner asked for an expedited hearing and averred that time was of the essence because “debtor’s [Mr. Warner’s] purchase of 501 Broadway is connected to the sale of debtor’s present home, involving financing by both debtor’s purchaser and by debtor’s vendor [the Tubbs] in his purchase of a new home.” Mr. Warner testified in his deposition that Mr. Schafer prepared all of his bankruptcy court pleadings, even after he was forced to withdraw from representation. And while Mr. Schafer did not deny this general .allegation at trial, he stated, with respect to the preparation of this particular motion: “I can tell you that I can’t tell you specifically that I did.”[15] Mr. Tubbs testified that at this point he also asked Mr. Schafer whether he should list the Broadway Street home for sale and seek out other buyers. Mr. Schafer, according to Mr. Tubbs, told him that he did not need to because the Bankruptcy Court had already approved the sales. ,
The hearing on the motion in Bankruptcy Court was set to oecur on March 23, 1999 — -two days before Mr. Warner called Mr. Tubbs asking for an extension — but was continued to April 13, 1999. Although he ruled from the bench in favor of Mr. Warner, the bankruptcy judge waited until May 11, 1999, to issue an order giving approval for the sale of Mr. Warner’s Fairway Drive home, Mr. Warner’s purchase of *644 the Tubbs’ home, and the tender of the balance of the sale funds to Mr. Warner’s creditors. Mr. Tubbs testified that at this point Mr. Schafer informed him that the Bankruptcy Court had approved the sales. He then wrote to Mr. Schafer |19on April 18, 1999, and forwarded a proposed extension to the April 30 act of sale in which the Tubbs warrant “that loan approval has been obtained.” The Schafers did not sign this form, preferring instead to confect their own. The Schafers, Tubbs, and War-ners then executed the respective amendments to the purchase agreements which continued the closing dates to June 1, 1999.
The Tubbs, however, learned several weeks before the June 1 closing that several of Mr. Warner’s creditors had petitioned the Bankruptcy Court to reconsider its approval of Mr. Warner’s course ■ of action.[16] Concerned, Mr. Tubbs contacted Mr. Schafer, who again attempted to calm his fears: “He said it was just a — a hearing, that it was not of any consequence, it wasn’t a big deal., He wasn’t even attending, going to attend because he didn’t want to — because of his relationship with the judge, he. didn’t want to make it look like there was any favoritism.”
Mr. Schafer testified that he called and spoke with Mr. Tubbs after first learning of the motion to set aside the sales. He also testified that he urged Mr. Tubbs to hire an attorney to represent his interests in the Warner bankruptcy. Mr. Tubbs testified, however, that Mr. Schafer attempted to dissuade him from hiring his own attorney, claiming that “it would screw up the works” and be a “waste of money.” Noting that his “trust factor” in Mr. Schafer was eroding, Mr. Tubbs hired counsel to represent his family’s interests in the Bankruptcy Court hearing. 12(lMr. Warner and Mr. Tubbs, but not Mr. Schafer, attended the May 24, 1999 hearing.
. Despite Mr. Schafer’s assurances, the bankruptcy judge from the bench rescinded his approval of Mr. Warner’s proposed course of action. Later that day, Mr. Tubbs’ attorney spoke on the telephone with Mr. Schafer. She subsequently sent him a letter in which she noted that Mr. Schafer had offered to release the Tubbs from the purchase agreement: “I am writing to confirm that you have offered to release my clients, Michael and Leah Tubbs, from the Agreement to Purchase of Sell the property ... I will contact you shortly with my clients’ response.” Mr. Schafer replied later that day. His letter notes that he had discussed the conversation with his wife — a conversation she denied at trial — but that she was unwilling to agree to a release of the Tubbs. Instead, Mr. Schafer proposed a further extension of the closing date in order to allow the Tubbs “the opportunity to sell their home to another party, since that was their in: tention at the time of signing the contract to purchase 1100 State Street.” Despite this language in his letter, Mr. Schafer testified at trial that he was unaware at the time he wrote it that the Tubbs’ financing with Countrywide was conditioned upon the sale of their home. Rather, he explained, the language merely reflected his assumption that the Tubbs — a young couple with two small children — were intending to sell their home. Mr. Schafer also denied offering to release the Tubbs, claiming instead that the proposal was first mooted by Mr. Tubbs’ attorney.'
IgiAt this time — late May 1999 — the parties did not extend the closing date, aiming *645 instead to pass the acts by the June 15, 1999 deadline. As the deadline approached, Mr. Tubbs telephoned Mr. Warner in order to find out whether -he would be able to close on the sales. Mr. Tubbs was able to speak with Mr. Warner’s bookkeeper, who informed him that Mr. Warner would not be able to purchase the Tubbs’ home because he had lost the buyer for his Fairway Drive home.[17] Mr. Tubbs then called and spoke with Mr. Schafer. According to Mr. Tubbs, Mr. Schafer threatened to sue him- and his wife if they did not proceed to sale on June 15, 1999, or agree to an additional extension of the closing date.
The Tubbs then agreed to extend the act of sale to August 13, 1999, and put their home on the market. The Tubbs’ lock-in agreement with Countrywide, unfortunately, expired on August 11, 1999. Because the interest rates had gone up since the initial lock-in agreement was issued in March of 1999, Countrywide would not consent to a further extension at an interest rate of 6.25% unless the Tubbs agreed to, purchase discount points. If the Tubbs did not purchase discount points, Countrywide would have given them no less than an 8.375% interest rate. Mr. Tubbs testified that at this point he and his wife could not afford to purchase discount points, and the evidence indicates that the purchase agreement obligated him to secure an interest rate of no more than 7%. ■ The Tubbs, accordingly, lost their conditional financing with Countrywide.
|220n August 12,1999, the Tubbs notified the Schafers that they no longer had financing. Mr. - Schafer testified that this was the first time that he learned that the Tubbs’ financing was conditioned upon the sale of their Broadway home. The Schaf-ers responded-by setting the act of sale for August 13, 1999. The Tubbs did not attend and title was not passed. The Schaf-ers, by way of letter to the Tubbs, subsequently declared the demand promissory note' to be forfeited according to the terms of the purchase agreement. The Tubbs refused to pay any portion of the demand note and the Schafers filed suit shortly thereafter.[18]
B
 The issue for a reviewing court to resolve when faced with a fact finding is not whether the trier of fact was Tight or wrong, but whether the fact-finder’s conclusion was a reasonable one;" even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder’s, reasonable evaluations of credibility, and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. See Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880, 882 (La.1993) (citations omitted). This review standard is based, in part, on the trial court’s ability to better evaluate the testimony of live witnesses, compared with an *646 appellate court’s sole reliance upon a written record. In addition, the standard is based on “the proper 1 ^allocation of trial and appellate functions between the respective courts.” Stobart, 617 So.2d at 883, quoting Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973), superseded by statute on other grounds as noted in Walls v. Am. Optical Corp., 98-0455 (La.9/8/99), 740 So.2d 1262, 1265. Consequently, when there are two permissible views of the evidence, the trier of fact’s choice between them cannot be manifestly erroneous. See Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
As pointed out in Lasyone v. Kansas City Southern R.R., 00-2628 p. 6 (La.4/3/01), 786 So.2d 682, 688-689, “[t]hese standards for manifest error review are not new. They are the guiding principles that aid our courts of appeal, which are our error correcting courts, when reviewing a trial court’s factual determinations.” The manifest error standard of review also applies to mixed questions of law and fact. See Bates v. City of New Orleans, 13-1153, p. 7 (La.App. 4 Cir. 3/26/14), 137 So.3d 774, 780. Lastly, we note that when reviewing questions of law we are simply to determine whether the trial court was legally correct or incorrect. See Goodrich Petroleum Co., LLC v. MRC Energy Co., 13-1435, p. 13 (La.App. 4 Cir. 4/16/14), 137 So.3d 200, 207.
The evidence fully supports the trial judge’s conclusion that the Tubbs had a good faith belief that they had financing when they forwarded the proposed extension agreement to the Schafers on April 18,1999. There is no doubt that Countrywide conditioned its loan approval with the Tubbs on the sale of their Broadway home. It is likewise clear that the Bankruptcy Court granted Mr. Warner’s motion seeking authorization to sell his current home and purchase the | a4Tubbs’ home on April 13, 1999. Mr. Tubbs testified that at this point he learned from Mr. Schafer that the Bankruptcy Judge had approved the sales.[19] The Tubbs then forwarded to the Schafers their proposed extension — which warranted that they had loan approval — on April 18, 1999. Clearly, the trial judge was not manifestly erroneous in concluding that the Tubbs had a good faith belief on April 18, 1999, that Countrywide’s condition had been met and that they had financing in accordance with the terms of the purchase agreement.
The record also supports the trial judge’s conclusion that the Schafers knew that the Tubbs’ financing with Countrywide was conditioned upon the sale of their Broadway home. As should be evident from our examination of the facts, the Tubbs have contended consistently that they told the Schafers about Countrywide’s financing condition. The Schafers, on the other hand, have consistently maintained that they did not know of the condition until August 12, 1999, when they learned that the Tubbs no longer had financing. The trial judge, explicitly, found *647 the Tubbs’ testimony to be more credible on this point.[20]
When “a factfinder’s finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly ^erroneous or clearly wrong.” Rosell, 549 So.2d at 845. “[A]nd where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.” Id. We do not overturn a factfinder’s reasonable credibility determinations. See Duncan v. Bartholomew, 11-0855, p. 13 (La.App. 4 Cir. 3/14/12), 88 So.3d 698, 709. Having reviewed the record, we eannot say that the trial judge’s decision to credit the testimony of the Tubbs over that of the Schafers is manifestly erroneous or clearly wrong. Having credited the Tubbs, the trial judge could hardly have found them liable to the Schaf-ers for misrepresentation.
IV
Having concluded that the trial judge was not clearly wrong in rejecting the Schafers’ main argument that the suspen-sive condition was fulfilled through the fault of the Tubbs, we turn now to review the trial judge’s finding that the suspen-sive condition failed and the agreement is null and void.
In order to determine whether ’ the Tubbs had timely obtained financing for their intended purchase, it was necessary for the trial judge to review the commitment letter that the Tubbs had received from their prospective lender, Countrywide Home Loans, Inc. Although Countrywide’s commitment letter superficially satisfied the specific terms of the purchase-sell agreement’s requirements respecting a mortgage loan in the amount of $424,400.00 at a rate of interest not to exceed 7% per annum, interest and principal payable in equal |¡>fimonthly installments, over a period of 30 years, the commitment letter itself contained a sus-pensive condition. The Schafers, it seems to us, pointedly overlook this indisputable feature of Countrywide’s commitment letter.
The suspensive condition of the financing commitment was that the Tubbs must sell their own Broadway home and use a substantial amount of the proceeds toward the purchase price. Specifically, the lender conditioned its financing offer upon the Tubbs selling their Broadway home and applying $106,000 from the proceeds towards the purchase of the Schafers’ home.[21] This condition is hardly surprising in the light that the Tubbs had no cash on hand and thus needed to make their good faith deposit by a promissory note. And, from a lender’s perspective, it is reasonable to insure that the Tubbs would not be trying to make mortgage payments on two homes.
Countrywide’s home loan consultant testified without contradiction that Mr. Tubbs was. persistent in attempting to obtain more favorable or less onerous financing terms from Countrywide. Vicki Cummins, the consultant, testified that she worked with Mr. Tubbs as he sought to secure *648 financing: “Mr. Tubbs made every attempt possible to get this loan. He was willing to pull money out of 40Ts, get money from family members, he attempted to do the second, to borrow the money to help with that. Almost so much to the point that he aggravated everyone in this office on a regular basis. I feel like that’s the gist of where we’re trying to get at, is did he make a good faith and attempt in every way he did.” •
j^jAgain, we review the trial judge’s factual finding under the manifest error-clearly wrong standard. See Hall v. Folger Coffee Co., 03-1734, p. 9 (La.4/14/04), 874 So.2d 90, 98. In order to reverse ffie such findings, “an appellate court must undertake a two-part inquiry: 1) the court must find from the record that a reasonable factual basis does not exist for the finding of the trier of fact; and 2) the court must further, determine that the record establishes the finding is. clearly wrong.” Scarberry v. Entergy Corp, 13-0214, p. 16 (La.App.2/19/14), 136 So.3d 194, 207.
The trial judge found as a fact that as of the date set for the sale closing called by' the Schafers, the Tubbs had not sold their house. Here again, this finding cannot be contested on the basis of the evidence. Thus, the condition of the'commitment letter failed. The Tubbs thus had no financing commitment, and as a consequence the condition of the purchase-sell agreement failed.
Under the purchase agreement, the Schafers’ primary obligation was to' deliver and warrant merchantable title. See La. Civil Code art. 2475. In the event of their breach, the Tubbs were entitled to a return of the deposit in full plus an equal amount to be paid as-- a penalty. This penal provision is a secondary obligation “for the purpose of enforcing the principal one.” La. Civil Code art. 2005. The Civil Code provides clearly .that the nullity “of the principal obligation renders the.stipulated damages clause null.” La. Civil Code art. 2006. The damage provision— or secondary..obligation—in the purchase agreement at issue, therefore, was vitiated by the failure of the principal obligation. That is, the |gsTubbs’ inability to obtain financing voided not only the .Schafers’ obligation to deliver. title but also their right to enforce the purchase agreement’s penal clause against the Schafers. See Richmond v. Krushevski, 243 La. 777, 782-785, 147 So.2d 212, 214 (1962); Stan Weber & Associates, Inc. v. Goodlett, 402 So.2d 745, 746-747 (La.App. 4th Cir.1981).
y
For the same reason that we find that the trial judge was not clearly wrong in her reasonable finding that the financing condition failed, thereby rendering the purchase-sell agreement null and void such that the Schafers could not recover the penalty of $53,050, we also find that the Tubbs cannot recover that amount—or any other amount—as damages.
We return to the Schafers’ remaining argument, that the trial judge’s awards of damages and attorneys’ fees to the Tubbs are legally erroneous. The trial judge indicated that she awarded the Tubbs damages because they “did not breach the purchase agreement” and were “entitled to the return of their prornissory note.” She, likewise, noted that her award of attorneys! fees was based upon language in the purchase agreement.[22] The Schafers argue that the purchase agreement cannot *649 serve as the source of the Tubbs’ right (or the Schafers’ obligation to pay) to collect fees and damages if it is first found to be null and unenforceable. We'agree.
lagGiven the trial judge’s finding that the Tubbs were unable, through no fault of their own, to secure financing by the date set for the act of sale, her conclusion that the purchase agreement was thus rendered null should not be controversial. It is, in fact, the only logical legal conclusion. See La. Civil Code art. 1773 (“If the condition is that an event shall occur within 'a fixed time and that time elapses without the occurrence .of the event, the condition is considered to have failed.”). “When a purchaser, through no fault of his own, is unable to- obtain the loan upon which the agreement is conditioned, the obligations imposed by the agreement are not binding upon the parties; the agreement is null and the parties are released from their obligations to perform.” Bacon v. Ford, 522 So.2d 1232, 1234-1235 (La.App. 4th Cir.1988).
The trial judge,, therefore, .committed legal error when she awarded the .Tubbs damages under the terms of the null purchase-sell agreement.
The award of attorneys’ fees to the Tubbs also constitutes legal error. “In Louisiana, the prevailing party may not recover attorneys’ fees except where authorized by contract or statute.” Borgnemouth Realty Co., Ltd. v. Parish of St. Bernard, 13-1651, p. 17 (La.App. 4 Cir. 5/21/14), 141 So.3d 891, 902. The failure of the purchase-sell agreement’s financing condition, as noted, rendered the entire agreement unenforceable. An award of attorneys’ fees cannot be based upon the provisions of a null, unenforceable contract. See Morvant v. Amoult, 490 So.2d 549, 552 (La.App. 4th Cir.1986). And the Tubbs have not directed us to any other source upon which to base an attorneys’ fee award. We must, therefore, |anamend the trial court’s judgment to delete its award of damages and attorneys’ fees to the Tubbs. Likewise,, we must also deny the Tubbs’ answer to the appeal, which asked for an increase in the award of damages.
VI
In this last Part of our explanation, we briefly address the Schafers’ remaining incidental complaints, raised in assignments of error, and not otherwise disposed of.
Despite the objective and documented fact that Countrywide’s financing commitment was conditioned on the sale by the Tubbs of their' Broadway home, the Schafers contend that the trial judge, im-permissibly using parol evidence, added a condition to the purchase-sell agreement not found in the written agreement. The Schafers are adamant that they knew nothing of this financing condition and had not made the sale of their State Street home conditioned on the Tubbs’ sale, of their Broadway home.
In support of their proposition, the Schafers urge us to compare and contrast the Tubbs-Sehafer purchase-sell agreement, which had no condition about the Tubbs selling their home, with the Warner-Tubbs purchase-sell agreement, which had a condition about the Warners selling their home. We grasp the difference, but the Schafers have misconstrued the trial judge’s findings. and conclusions. The Schafers, it seems, object to, as they characterize it, the trial judge’s acceptance of evidence upon which to establish that the Schafers knew that Countrywide conditioned its loan approval with the Tubbs upon the sale of their Broadway |3lhome. They point to the trial judge’s reference to two statements—one from Mr. Tubbs and one from Mrs. Tubbs—in her reasons for *650 judgment which statements were elicited by the Schafers’ own counsel during their case-in-chief.[23]
Having reviewed the record, we are convinced that this testimony was not elicited to vary any of the terms of the purchase-sell agreement. To the contrary, it is apparent that these statements were elicited by the Schafers in their own defense of the Tubbs’ claim, which they made in their reconventional demand. There the Tubbs contended that the Schaférs were well-aware of the need for the Tubbs to first sell their own home to generate sufficient cash to purchase the Schafers’ home. They pointed to the Schafers’ role in informing the Schafers’ friends, the War-ners, as to the availability of the Tubbs’ home for sale. . The Tubbs were seeking to establish that the Schafers knew that Countrywide conditioned its loan approval upon the Tubbs’ sale of their home yet misrepresented to them the ability of the Tubbs’ prospective purchasers, the War-ners, who were the close friends of the Schafers, to ■ buy the Broadway home. This evidence is also relevant to the Tubbs’ defense to the Schafers’ claims that the Tubbs misled them into believing that they had loan approval, and breached the purchase agreement by failing to make a good faith effort to secure financing. - Clearly, the complained-of testimony was not improperly relied upon parol evidence to expand the terms of the Schafers’ purchase agreement with the Tubbs.
| S2The Schafers also assign as error the trial judge’s factual finding that Mr. Schafer drafted the purchase agreement, especially the provision which states that “[e]ither party hereto who fails to comply with the terms of this offer, if accepted, is obligated to pay all fees and costs incurred in.enforcing collection and damages.” We have reviewed the record on this point and find both that a reasonable factual basis exists for this finding and that the trial judge was not clearly wrong in her determination. But, more importantly, given her correct finding that the purchase agreement was unambiguous, it is unremarkable that the trial judge applied no presumption construing the purchase agreement against the Schafers. See La. Civil Code art. 2056 (“In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text.”); see, e.g., Pollard v. Schiff, 13-1682, p. 10 (La.App. 4 Cir. 2/4/15), 161 So.3d 48, 55. Therefore, even if erroneous or clearly wrong, this factual error would not be so material as to require reversal or our de novo beview of the record. See Ferrell, 94-1252, p. 4, 650 So.2d at 745. And, in light of our explanation in Part V, ante, the complaint, such that it is, is mooted.
The Schafers also assign as error that the trial judge erred as a matter of law by failing to apply the presumption arising from the failure to call a witness. See, e.g., Gurley v. Schwegmann Supermarkets, Inc., 617 So.2d 41, 43-44 (La.App. 4th Cir.1993). But the Schafers, however, did not raise this issue before the trial court below. Generally, issues not raised in the trial court will not be given consideration for the first time on appeal. See Rule 1-3, Uniform Rules-Courts of Appeal; Scott v. Zaheri, 14-0726, p. 14 (La.App. 4 Cir. 12/3/14), 157 So.3d 779, 788. We, therefore, do not consider this assignment of error.
CONCLUSION
The trial court judgment dated June 25, 2014, is amended in the following particu *651 lars: 1) the award of $5,000.00 in damages to the Tubbs is deleted; and 2) the trial court’s award of attorneys’ fees to the Tubbs is deleted. In all remaining matters, the trial court’s June 25, 2014 judgment in favor of Leah Smith divorced wife of/and Michael F. Tubbs and against Mi-gnon Rousset, wife of/and Thomas E. Schafer, III, is unchanged.
DECREE
The judgment rendered on June- 25, 2014 is amended to read as follows:
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of defendants, Leah Smith divorced wife/of and Michael F. Tubbs, and against plaintiffs, Mignon Rousset, wife of/ and Thomas Schafer III, dismissing plaintiffs’ suit with prejudice.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of plaintiffs-in-reconvention, Leah Smith divorced wife of/and Michael F. Tubbs, and against defendants-in-reconvention, Mignon Rousset, wife of/and Thomas Schafer III, decreeing the cancellation and return of the promissory note dated February 23, 1999, within ten days of the finality of this judgment
All costs are taxed to defendants-in-re-convention.
The judgment rendered on June 25, 2014, by the trial court, as amended by us, is affirmed.
JUDGMENT AMENDED AND, AS AMENDED, AFFIRMED.

. We are aware of the grammatical convention which indicates that a proper noun that ends in an "s” should be made plural by the addition of “es.” See, e.g., Texas Law Review Association, Texas Law Review Manual on Usage & Style § 1.1.(10th ed. 2005), We find, however, that the sheer volume of references to “the Tubbses” or “the Tubbses' ” throughout our opinion is burdensome to the reader. We also note that all parties refer to the Tubbses collectively in their memoranda to this court as the “Tubbs.” We, accordingly, refer to Mr, and Mrs. Tubbs collectively throughout our opinion as “the Tubbs.”

. See La. C.C.P. art. 2133 A.

. "The seller is bound to deliver the thing sold and to warrant to the buyer ownership and peaceful possession of, and the absence of hidden defects in, that thing. The seller also warrants that the thing sold is fit for its intended use:”

. “The buyer is bound to pay the price and to take delivery of the thing.”

. There were no real estate agents or brokers assisting the parties. But it is this provision which implies an obligation, to return the . good faith deposit in the event the agreement becomes null and void.

. The judgment did not explicitly dismiss the Schafers’ petition, but we treat the principal demand as dismissed with prejudice. See M.J. Farms, Ltd. v. Exxon Mobil Corp., 07-2371, p. 12 (La.7/1/08), 998 So.2d 16, 26 (“Generally, when a trial court judgment is silent as to a claim or demand, it is presumed the relief sought was denied.”).

. The Schafers, for the first time on appeal, also argue that the trial judge erred when she failed to find that the Tubbs suppressed the truth as to the financing commitment received from Countrywide. The Schafers base this argument on an unsent draft of the proposed extension wherein the Tubbs state explicitly that “conditional loan approval has been obtained and is subject to the act of sale of 501 Broadway on or prior to June 1, 1999.” We, however, forego discussing this argument because the Schafers failed to present it first to the trial court. See Rule 1-3, Uniform Rules-Courts of Appeal; Scott v. Zaheri, 14-0726, p. 14 (La.App. 4 Cir. 12/3/14), 157 So.3d 779, 788.

. The Schafers refused to sign this form, electing instead to prepare their own, which made no mention of financing.

. We observe that both parties introduced copies of the Schafers' February 22, 1999 counteroffer. While the Schafers’ exhibit features markings which indicate that it was faxed, the copy introduced by the Tubbs lacles such markings.

. Because of medical complications connected to his final illness, Mr. Warner was unable to testify at trial. Instead, the parties introduced the transcript of his deposition in lieu of his live testimony.

. Both parties introduced this letter into evidence.

. Mr. Schafer explained a trial that he asked for the additional monéy from the Tubbs in order to pacify his wife because "she was more emotional about this than I was.”

. Mr. Schafer testified in his case-in-chief that Mr. Warner went through two Chapter 11 bankruptcy proceedings. The first ended without a confirmed plan of reorganization, and Mr. Warner was unable to pay Mr. Schafer’s legal fees. ' Nine months after the first proceeding ended, Mr. Warner again filed for Chapter 11 reorganization. However, Mr. Schafer could no longer represent Mr. Warner in Bankruptcy Court because he now stood in the posture of a creditor. Mr. Schafer then withdrew from the case and Mr. Warner represented himself throughout the remainder of the second bankruptcy proceeding.

. Mr. Schafer testified that Mr. Warner informed him on March 3, 1999, of his intent to purchase the Tubbs’ home.

. Although Mr. Schafer did not deny drafting this motion, he asserted at trial that he still did not know as of March 11, 1999, that the Tubbs’ purchase of his home was condi- . tioned upon the sale of theirs.

. Mr. Tubbs testified that he-learned of the creditor's motion to set aside the sale authorization from the attorney representing Whitney National Bank — another creditor — in Mr. Warner's bankruptcy proceeding.

. The Tubbs subsequently filed a third-party claim against the Warners seeking recompense for losses occasioned by the Warners’ alleged misrepresentation of facts concerning their financial and legal ability to purchase the Tdbbs’ home. Prior to trial, however, the Tubbs dismissed their claims against the War-ners.

. The Schafers' property eventually sold to another purchaser three months after the filing of the present suit and for $19,500 more than the Tubbs agreed to pay for it. The Schafers did not ask the trial court to award them any costs, fee,s, or damages associated with the subsequent sale, of their property nor have they assigned as error the trial courts lack of award on this issue. The Tubbs, likewise,. sold their home approximately eight months later but for $3,00.0 less than they would have had their sale to the Warners taken place. ■

. As noted, the Schafers assert as error the trial judge’s Factual finding that they misrepresented the Warners' ability to purchase the Tubbs' Broadway home. Having reviewed the record, we note that a reasonable factual basis exists for this finding and that the trial judge was not clearly wrong in her determination. We also observe that, despite her conclusion, the trial judge did not find the Schafers liable for the misrepresentation. Rather, she found that the Tubbs reasonably relied upon the Schafers' representation that the Warners had the financial means to purchase their Broadway home. These findings, therefore, even if erroneous or clearly wrong, are not so material as to require reversal or our de novo review of the record. See Ferrell v. Fireman’s Fund Ins. Co., 94-1252, p. 4 (La.2/20/95), 650 So.2d 742, 745.

. Of course, whether the Schafers actually knew of Countrywide's financing condition is only of consequence in the context of the Schafers’ contention that they were misled by the Tubbs. And, notably, the Schafers never asked to review the Tubbs’ commitment from Countrywide.

. On a subsequent extension, the lender only required that $70,000 of the proceeds of the sale of the Broadway home be applied to the Tubbs’ purchase of the State Street home.

. The parties modified the standard form provision to provide: “Either party hereto who fails to comply with the terms of this offer, if accepted, is obligated and agrees to pay all fees and costs incurred in enforcing collection and damages.”

. Although it is true that we review judgments and rulings, rather than underlying reasons, this assignment of error compels us to refer to the trial judge’s written reasons for judgment. See Scarberry, 13-0214, p. 13, 136 So.3d 194, 206.