JAMES F. MCEAY III, CHIEF JUDGE
11 This case involves an alleged breach of contract case between the owners of an immovable piece of property and their real estate agent.
FACTS AND PROCEDURAL HISTORY
Following initial contacts with real estate agents Eleanor Farnsworth and Lauren McCulloch, on December 11, 2009, Dr. Bruce Iteld and his wife, Sandy Iteld, entered into a marketing agreement with Gardner Realtors, LLC (Gardner) to market and sell their home located at 1516 Robert Street in New Orleans. The property was initially listed for sale at a price of three million three hundred fifty thousand dollars ($3,350,000.00). The home was over eight thousand (8,000) square feet and had many amenities, including a large generator, a wine cellar, a gymnasium, a saltwater pool, three home theatres, an elevator and an eight hundred (800) square foot guest house.
In December of 2009, Ms. Farnsworth placed a Gardner advertising sign in front of the subject property; this sign remained in front of the home for approximately two and a half years. Ms. Farns-worth and Ms. McCulloch alsoU advertised the subject property on the multiple listing service (MLS) as well as via a number of websites (Gardner’s website, eleanorfarns-worth.com, and luxuryrealestate.com) and publications (StCharles Avenue Magazine, The Times-Picayune, and Preservation Resource). Ms. Farnsworth, with the approval of Mrs. Iteld, had created a professionally-made brochure which included col- or photographs of the property. Soon after the property was initially listed with them, Gardner set up a large catered open house and invited a number of real estate brokers.
On December 17, 2010, Ms. McCulloch sent an email on Ms. Farnsworth’s email account to Mrs. Iteld seeking to extend the marketing agreement for another six months. After consulting with her husband, Mrs. Iteld agreed to the extension by replying “OK” to the email later that day. During this first extension, on April 26, 2011, Ms. Farnsworth received an offer of two million nine hundred thousand dollars ($2,900,000.00) to purchase the subject property from Frederic Larson, a real estate agent with Keller Williams, on behalf of one of his clients. However, the offer was rejected. Additionally, on April 28, 2011, the Itelds required that any potential buyers have a letter of pre-qualification before any viewing of the premises.
On June 24, 2011, Ms. Farnsworth sent an email to Mrs. Iteld seeking a second six month extension of the marketing agreement. After consulting with her husband, Mrs. Iteld agreed by emailing back “OK. Sandy” later that day. On | sOctober 31, 2011, Ms. Farnsworth received a “Letter of Intent to Purchase,” which the Itelds rejected.
On January 9, 2012, Ms. McCulloch again emailed Mrs. Iteld seeking a third six month extension. Mrs. Iteld once again, with the consent of her husband, agreed to a six month extension. On March 1, 2012, Gardner received a pre-qualification letter from Eric Gordon, a professional basketball player with the then New Orleans Hornets. Gardner showed the property to Mr. Gordon, but he did not make an offer. Hollywood actor Leonardo DiCaprio also viewed the property on three occasions in 2012.[1]
On June 20, 2012, Linda Phoenix, a real estate agent for 'then New Orleans Saints player Jabari Greer and his wife Katrina Greer, contacted Ms. Farnsworth regard *150 ing the Greers’ interest in the property. Ms. Phoenix provided Gardner with a letter from UBS Financial Services, Inc., which showed the Greers’ financial capability to purchase the property. After viewing the property, the Greers made an offer of two million one hundred thousand dollars ($2,100,000.00) on June 5, 2012. Dr. Iteld and Mrs. Iteld both signed a counteroffer to the Greers, offering to sell the subject property to the Greers for three million fifty thousand dollars ($3,050,000.00). On June 7, 2012, the Greers, through their agent Ms. Phoenix, executed an “Amendment to Agreement to Purchase or Sell” offering to purchase the subject property for two million four hundred thousand dollars ($2,400,000.00) in all cash. This offer was rejected by the Itelds.
|4Mrs. Iteld informed Gardner that the Itelds were seeking to refinance the subject property in 2012 and needed for the property to be removed from the MLS but requested that Gardner continue to market the property during the refinancing period. Temporarily removing a property from the MLS in order to effectuate a refinancing is common process. On June 28, 2012, Ms. McCulloch sent an email to the Itelds stating the following: “Dear Sandy; Please find attached the cancellation of the marketing agreement for 1516 Robert Street. Please sign and return so we can process it. Let me know when the refinancing has been completed so that we can enter it back into the system.” Thereafter, on June 28, 2012, both of the Itelds and Ms. Farns-worth, on behalf of Gardner, executed the cancellation of marketing agreement. In pertinent part, the marketing agreement stated as follows:
It is hereby agreed that the expiration of the above referenced Marketing Agreement be changed from 7/29/2012 to 6/28/2012 in consideration of the early termination... In addition, any sale of the property negotiated within 6 months after the amended termination date to any party to whom said property was submitted during the term of the Marketing Agreement will be subject to a commission of 6/4% or $N/A. It is further agreed that if this property is offered for sale at any time within six (6) months after the amended termination date, the property will be listed exclusively with GARDNER REALTORS, for a period of no less than the original Marketing Agreement at the commission terms, and conditions agreed to in the Marketing Agreement...
The cancellation agreement illustrates that the Itelds were under contract with Gardner through July 9, 2012, and that if they desired to offer the property for sale within the next six (6) months, they were contractually required to use Gardner to do so. Therefore, Gardner continued to place a for sale sign in front of | Rthe subject property and continued to market the property in various periodicals throughout the remainder of 2012.
On July 2, 2012, Mrs. Iteld left a message on Ms. Farnsworth’s voicemail asking Ms. Farnsworth to call her. Ms. Farns-worth' returned Mrs. Iteld’s call and was informed by her that a new prospective purchaser, Ashton Soniat, was interested in the property. Thereafter, Ms. Farns-worth made contact with Mr. Soniat and sent him a copy of the brochure she had made. Ms. Farnsworth informed Mr. Soni-at about the details of the home, the location, the neighborhood, and that the Itelds were not interested in any lowball offers. Ms. Farnsworth and Ms. McCulloch communicated with Mr. Soniat on several more occasions during July of 2012, both by phone and email.
On July 29, 2012, Ms. McCulloch spoke with Mrs. Iteld by telephone. During this conversation, Mrs. Iteld mentioned that *151 Mr. Soniat had discussed the idea of cutting out her agents. In early August of 2012, the Itelds, through their attorney Lanny Zatzkis, received an offer from Mr. Soniat to purchase the subject property. This offer was apparently rejected by the Itelds.
On September 6, 2012, the Itelds received a second offer to purchase the property from Mr. Soniat, again through Mr. Zatzkis. On September 13, 2012, the Itelds executed a “Louisiana Agreement to Buy or Sell.” The Itelds agreed to sell the subject property to Mr. Soniat for two million eight hundred thousand dollars ($2,800,000.00). The property was sold to Mr. Soniat on December 3, 2012. Gardner was not included in this transaction and no commission was paid. In early January of 2013, Ms. McCulloch discovered that Mr. Soniat had purchased the subject property from the Itelds.
|fiOn March 6, 2013, Gardner filed its petition for breach of contract and damages against the Itelds. Gardner later amended its petition to reflect its name change from GBS Properties LLC d/b/a Prudential Gardner Realtors, LLC. The Itelds answered the petition on March 25, 2013.
After a portion of the discovery had taken place, including the depositions of both Ms. Farnsworth and Ms. McCulloch, the Itelds filed a motion for summary judgment on October 24, 2013. Gardner filed an opposition to this motion and on November 23, 2013, Gardner filed its own motion for summary judgment. Following a January 24, 2014 hearing, both Gardner’s and the Itelds’ motions for summary judgment were denied on March 11, 2014.
During the course of discovery in addition to the depositions of Ms. Farnsworth, Ms. McCulloch, the depositions of Sylvia Roy, Diego Patino[2] and Mr. Soniat were all taken. On February 4, 2015, the Itelds filed another motion for summary judgment. Thereafter, Gardner filed a cross-motion for summary judgment on March 20, 2015. On May 22, 2015, both the Itelds’ and Gardner’s motions for summary judgment were once again heard before the trial court and once again denied by the trial court on June 8,2015.
On June 18, 2015, the Itelds filed a motion for new trial regarding the trial court’s denial of their motion for summary judgment. Gardner filed an opposition to the motion for new trial and a hearing took place .on July 24, 2015. On August 14, 2005, the trial court granted the motion for new trial but again denied the motion for summary judgment.
17A jury trial took place from August 31, 2015 through September 4, 2015. On September 4, 2015, the jury rendered its verdict in favor of Gardner and awarded it the $114,000.00 in commissions prayed for. The jury found that Gardner had á valid marketing agreement with the Itelds, that the extension agreements were valid, and that the Itelds breached their agreement with Gardner.
On September 28, 2015, Gardner filed a motion for contradictory hearing for the award of attorney’s fees and finalization of the judgment with order. A hearing took place on December 9, 2015, where the trial court awarded Gardner “attorneys’ fees in the amount of FORTY-FIVE THOUSAND, SIX HUNDRED ($45,600.00) DOLLARS, being FORTY (40%) PERCENT of the Judgment rendered on the jury verdict in this case of $114,000, plus *152 judicial interest on said award of attorneys’ fees from the date of judicial demand until paid” as well as costs stipulated by the parties to be five thousand & 00/100 dollars ($5,000.00) as rendered by the judgment signed on December 16, 2015.
On December 22, 2015, the Itelds filed a motion and order for suspensive appeal. The following day, Gardner filed a motion for a new trial on the issue of the award of attorney’s fees. On January 19, 2016, the trial court, sua sponte, issued an order vacating a portion of its order regarding attorney’s fees. A hearing on the motion for new trial took place on February 19, 2016. The trial court granted the motion for new trial on February 24, 2016 and ruled that the “amount of attorney’s fees to be awarded is equal to 40% of the total amount collected.”
On March 3, 2016, the Itelds filed their notice of suspensive appeal. On May 5, 2016, Gardner answered the appeal, seeking a modification of the attorney’s fees award.
^DISCUSSION
On appeal, the defendants raise twenty-two issues for review or specifications of error. However, the defendants only argue and brief nineteen of these issues or specifications, namely one through seventeen, nineteen, and twenty-two. It is well settled that if an appellant identifies an assignment of error or issue presented for review, but fails to brief that point with citations to the record and support in the law, that issue or assignment is deemed waived. McMaster v. Progressive Sec. Ins. Co., 2014-0155 (La.App. 4 Cir. 10/29/14), 152 So.3d 979, 983; Uniform Rules Courts of Appeal, Rule 2—12.4(B)(4). The remaining nineteen issues or specifications may be grouped into seven broader areas: (1) expert opinions; (2) the marketing agreement; (3) the extension agreements; (4) the cancellation agreement; (5) motions for summary judgment; (6) attorney’s fees; and (7) judicial interest. The plaintiffs have answered the appeal and seek additional attorney fees.
Standard of Review
An appellate court generally reviews the factual findings of a trial court according to the manifest error standard of review. Powell v. Regional Transit Authority, 96-0715 (La. 6/18/97), 695 So.2d 1326, 1328. This standard, which applies to jury trials, has been stated as follows:
When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court’s finding, on review the appellate' court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court’s better capacity to evaluate live) n witnesses (as compared with the appellate court’s access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.
Id. at 1329; Canter v. Koehring Co., 283 So.2d 716, 724 (La. 1973).
Again, a court of appeal may not set aside the jury’s finding of fact in absence of “manifest error” or unless it is “clearly wrong.” Stamps v. Dunham, 2007-0095 (La. App. 4 Cir. 9/19/07), 968 So.2d 739, 742. The Louisiana Supreme Court has provided a two-prong test for the reversal of a *153 factfinder’s determinations: (1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong or manifestly erroneous. Stobart v. State through DOTD, 617 So.2d 880, 882 (La. 1993) citing Mart v. Hill, 505 So.2d 1120, 1127 (La. 1987). The issue to be resolved by the appellate court is not whether the trier of fact was right or wrong, but whether the factfinder’s conclusions were reasonable. Stamps v. Dunham, 969 So.2d at 743.

Expert Opinions

The Itelds argue that they were the only party to enlist an expert at trial, and as a result, such testimony was unre-futed and must be accepted as true. However, while the Itelds were the only party to enlist an expert at trial, the jury was within its fact-finding discretion to reject the opinions of the experts at trial. The jury has the. latitude to choose between witnesses, including expert witnesses, and to use such expert testimony together with its own common sense and experience to arrive at its conclusions of fact. Burns v. CLK Investments V, L.L.C., 2010-0277 (La.App. 4 Cir. 9/1/10), 45 So.3d 1152; La. C. Evid. Art. 704. The jury may choose the opinion of one expert, or even reject the opinion of the sole expert. Bachemin v. Anderson, 97-2471 (La.App. 4 Cir. 7/29/98), 717 So.2d 677, 680. The jury’s acceptance, or rejection, of part or all of each expert’s testimony is within its discretion in fact finding. Joseph v. Archdiocese of New Orleans, 2010-0659 (La.App. 4 Cir. 11/10/10), 52 So.3d 203.
In the instant case, the Itelds sought the expert opinion of Michael Indest, a paralegal and two-week law student at the time of trial, who was qualified as an expert in real estate rules and regulations, real estate standard of practice, and procuring cause for rental sales and commissions. He opined that after the marketing agreement’s terms had completed, a new marketing agreement had to be drawn up and signed by all owners of the property and that the e-mail extensions were invalid. However, when cross-examined, Mr. Ind-est could not point to any form of law or statute to support his contentions. The Itelds also enlisted Arlene Edwards, an attorney for the Louisiana Real Estate Commission, as an expert in the field of real estate rules and regulations at trial. Ms. Edwards’s testimony echoed Mr. Ind-est’s testimony. She testified that a new marketing agreement was required to be drawn up after the end of the initial term of the market agreement. Ms, Edwards also testified that the three extension agreements were not in compliance with the Louisiana Real Estate Commission rules. However, when cross-examined, Ms. Edwards could not direct the jury to any law which required that the extension agreements must be signed by all the parties. Accordingly, we find no error in the jury’s discounting of the testimony of the Itelds’ experts.

Marketing Agreement

I^The version of La. R.S.37:1431(30)[3] in force at the time of trial provides the following:
“Listing agreement” means a written document signed by all owners of real estate or their authorized attorney in fact authorizing a broker to offer or *154 advertise real estate described in such document for sale or lease on specified terms for a defined period of time. A listing agreement shall only be valid if signed by all owners or their authorized attorney in fact.
The Rules and Regulations of the Louisiana Real Estate Commission serve as an extension of Louisiana real estate law and assist the Louisiana Real Estate Commission in the enforcement and administration thereof. Section 2503(A) of the Rules and Regulations dealing with owner authorization provides:
No broker or licensee sponsored by said broker shall in any way advertise property belonging to other persons as being for sale or rent or place a sign on any such property offering the property for sale or rent without first obtaining the written' authorization to do so by all owners of the property or their authorized attorney in fact.
In the instant case, the Itelds entered into a marketing agreement with Gardner to market and sell the subject property. The marketing agreement was signed by Ms. Farnsworth and Ms. Sylvia Roy of Gardner as well as both Dr. Bruce Iteld and his wife Sandy Iteld. Accordingly, the marketing agreement was valid.

Extension Agreements

The Itelds contend that under La. R.S. 37:1431(30) and Louisiana's rules and regulations applicable to all real estate agents, “all home owners must sign a listing agreement or ‘extension’ (in advance of the listing agreement expiring) for an agent to be authorized to advertise and sell a home.” However, the word 112“extension” that was included in the above quote is not present under the provisions of La. R.S. 37:1431(30) or under any other Louisiana statute or law dealing with real estate. For the Itelds to argue that the extension agreements are not in compliance with the law is erroneous. Furthermore, their assertion that an extension agreement must be signed by all owners in advance of the listing agreement expiring in order for Gardner to continue to market the subject property is baseless, not supported by Louisiana law, and in direct opposition to the intent of the parties.
This Court has held that a hiatus between an original contract’s expiration and the drawing up of the extension contract cannot be used to avoid giving legal effect to the client and the realtor’s intent. Latter & Blum, Inc. v. Nodier, 442 So.2d 854, 858 (La.App. 4 Cir. 1983). Legal agreements have the effect of law upon the parties and none but the parties can abrogate or modify them. Id. Courts are bound to give legal effect to all such contracts according to the true intent of the parties. Louisiana Nat’l Leasing Corp. v. A.D.F. Serv., Inc., 377 So.2d 92 (La. 1979). Based on the actions of the parties in the instant case, it is obvious that the Itelds intended for Ms. Farnsworth to continue to market the property on behalf of Gardner.

Cancellation Agreement

The Itelds’ claim that the cancellation agreement was not valid need not be addressed by this Court. The jury found that there was a valid marketing agreement in existence between the Itelds and Gardner on or after June 28, 2012. We agree with this finding. Only if the jury did not find that a valid marketing agreement was in existence would the question of whether a valid cancellation 11sagreement was in existence between Gardner and the Itelds on or after June 28, 2012 be broached.
In any event, the arguments put forward by the Itelds as to why the cancellation agreement was not valid, lack merit. The Itelds argue that they did not “offer the *155 [subject] property for sale” within six (6) months after the cancellation agreement. However, less than three days after the execution of the cancellation agreement, Mrs. Iteld requested that Ms. Farnsworth market the subject property to the eventual purchaser, Mr. Soniat, and vet his financial capability to purchase the property. The cancellation agreement was executed by Ms. Farnsworth, on behalf of Gardner, and by both Dr. and Mrs. Iteld. The Itelds’ sole purpose in causing the cancellation agreement to be executed was so that they could refinance the property.

Motions for Summary Judgment

As noted above, two motions for summary judgment filed by the Itelds were denied by the trial court. The Itelds failed to file a supervisory writ regarding the denials of their motions for summary judgment. However, throughout the entirety of their appellant’s brief, arguments are raised as to why their motions for summary judgment should have been granted. If the Itelds desired to appeal the denial of their motions for summary judgment, the proper avenue to do so was to file a supervisory writ before this Court. See Herlitz Constr. Co. v. Hotel Investors of New Iberia, Inc., 396 So.2d 878 (La. 3/30/81). Such arguments are not now properly before this Court.

Attorney’s Fees

The trial court initially agreed with the jury’s verdict and awarded attorney’s fees of $45,600.00 (40% of the $114,000.00 verdict), based on the contingency fee | ucontract between Gardner and its attorney, Mr. Ricci. However, the trial court later required a hearing on the amount of attorney’s fees to be awarded. After several motions and several hearings took place, the trial court awarded Gardner the “amount of attorney’s fees to be awarded is equal to 40% of the total amount collected.”
The attorney’s fees award on “any judgment collected” is actually circular, whereby attorney’s fees cannot be calculated with finality because attorney’s fees would be awarded on the attorney’s fee award itself. Attorney’s fees not provided for by contract or statute cannot be awarded. Rousset v. Smith, 2014-1409 (La.App. 4 Cir. 9/23/15), 176 So.3d 632. Thus, Gardner’s entitlement to an attorney’s fee award was governed by the contract between Gardner and the Itelds, namely the marketing agreement. The marketing agreement provided: “In case of employment of counsel to enforce this agreement, Seller(s) will pay all costs and reasonable attorney’s fees incurred by broker...” Therefore, the marketing agreement itself limited Gardner’s reimbursement for attorney’s fees to the amount of attorney’s fees Gardner actually incurred or owed. Accordingly, we reverse the trial court’s award of attorney’s fees arid reinstate the jury’s award of 40% of the $114,000.00 verdict or- $45,600.00.

Judicial Interest

The trial court imposed the jury’s award of legal interest from the date of contractual breach. The Itelds argued that interest should have been awarded only from the date of judicial demand.
Legal interest , on a contract, like one in the instant case, is due from the date of breach. Thomas B. Catchings & Assoc. v. City of Baton Rouge, 621 So.2d 768, 769 (La. 1993). Therefore, judicial interest is owed on the principal amount of the Injury verdict of $114,000.00 from the date of breach. However, interest on the attorney’s fees would only be due from the date that those attorney’s fees, which are a form of penalty, are actually awarded. See Sher v. Lafayette Ins. Co., 2007-2441 (La. *156 4/8/08), 988 So.2d 186. Therefore, in the instant case, any award of interest on the attorney’s fees would only be from the date those attorney’s fees were awarded.
We amend the trial court’s award of judicial interest to reflect that legal interest is due on the principal amount from the date of the breach, but the interest on attorney’s fees is only from the date of award.
CONCLUSION
For the above and foregoing reasons, we affirm the judgment below in all but two respects. First, we amend the trial court’s judgment to reinstate the jury’s verdict to award attorney fees of 40% on the $114,000.00 verdict or $45,000.00. Secondly, we amend the judgment to reflect that legal interest on the award of attorney’s fees is only due from the date of the award.
AFFIRMED AS AMENDED
JENKINS, J., CONCURS IN PART AND DISSENTS IN PART

. When dealing with Mr. DiCaprio, the Itelds did not require a pre-qualification letter.

. Mr. Patino, a representative of Morgan Stanley, worked with the Itelds in the refinancing of the property.

. La.R.S.37:1431(30) at the time of trial was the definition of a "listing agreement.” Since the time of the trial, the Louisiana legislature has moved some of the terms in the definitions section. The definition of "listing agreement” remains the same, but it is now presently defined under La. R.S. 37:1431(16).